Joseph TOUSSAINT, et al.,
Plaintiffs-Appellees,

v.

Samuel YOCKEY, Acting Director of Corrections, Reginald Pulley, Warden, San Quentin Prison; Robert Rees, Superintendent, Deuel Vocational Institution, Alan Stagner, Superintendent, Correctional Training Facility (Soledad), Defendants-Appellants.

Nos. 83–1678, 83–1775.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1983.

Decided Jan. 5, 1984.

Sanford Jay Rosen, Rosen & Remcho, San Francisco, Cal., James Smith, Smith, Snedeker & Comiskey, Sacramento, Cal., Bernard Zimmerman, Sarah Flanagan, Mark Chavez, Andrea Resnick, Sidney M. Wolinsky, Morris J. Baller, David Lew, San Francisco, Cal., Michael Satris, San Quentin, Cal., for plaintiffs-appellees.

William D. Stein, Karl Mayer, John Van de Kamp, San Francisco, Cal., for defendants-appellants.

Before TRASK, and CANBY, Circuit Judges, and SOLOMON *, District Judge.

---

* Honorable Gus J. Solomon, United States Senior District Judge for the District of Oregon, sitting by designation.

CANBY, Circuit Judge:

Plaintiffs are a class of approximately 2,000 prisoners confined in administrative segregation in four California State Prisons: Deuel Vocational Institution, Folsom Prison, San Quentin Prison, and Soledad Correctional Training Facility. Defendants are the wardens of the four prisons and the California Director of Corrections. Plaintiffs sought relief on two claims. In *Wright v. Enomoto,* 462 F.Supp. 397 (N.D. Cal.1976), aff'd, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) (*"Wright I"*), a three-judge panel convened pursuant to 28 U.S.C. § 2281, now repealed, granted relief on the first claim. The court concluded that the due process clause of the fourteenth amendment required certain procedures before a prisoner could be placed in administrative segregation.

This appeal involves the second claim for relief, based on the eighth amendment's prohibition of cruel and unusual punishment. A prior preliminary injunction, issued on November 3, 1980, was vacated by this court in *Wright v. Rushen,* 642 F.2d 1129 (9th Cir.1981) (*"Wright II"*). In *Wright II* we held that the district court erred in relying on a "totality of conditions" approach in analyzing the constitutionality of prison conditions.

On remand the district court entered detailed findings of fact and concluded that even when analyzed individually, many of the current conditions in administrative segregation at three of the institutions[1] are probably unconstitutional. Determining that plaintiffs had demonstrated a probability of success on the merits and that the balance of hardships tipped sharply in their favor, the court entered a new preliminary injunction. Defendants challenge the district court's conclusions on several grounds, each of which will be discussed in turn. We affirm all of the preliminary injunction except the provision relating to food services.

---

1. Folsom Prison was not included in the preliminary injunction at issue in this appeal.

## I. *Double Celling*

The district court found that prisoners who are confined in administrative segregation live in cells which in general are approximately six feet wide and eight to nine feet long. Each cell is furnished with a bed of some sort, a thin mattress, a pillow, a blanket, a coverless toilet and a sink. Each inmate is supplied a cardboard box in which to keep his personal belongings. Shelf space is minimal or in some cases non-existent. Many of the cells have no windows.[2] The district court found that double celling exacerbated the already bad conditions existing in these cells and engendered violence, tension and psychiatric problems. It therefore concluded that the practice of double-celling inmates in the housing units challenged in this action could not withstand constitutional scrutiny. In its preliminary injunction the court prohibited involuntary double celling for more than thirty days in any twelve-month period. It also limited double celling to cells larger than fifty square feet, in which a second bed, cot or bunk is provided.

In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Supreme Court held that in and of itself double-celling is not unconstitutional. The institution involved in *Rhodes* was described as "a top-flight, first-class facility." The cells averaged 63 square feet and contained a cabinet-type night stand, a cabinet, shelf and radio built into one of the walls, a wall-mounted sink with hot and cold running water and a toilet that the inmate could flush from inside the cell. All of the cells had a heating and air circulation vent near the ceiling and more than half of them had a window that the inmates could open

and close. All cells used to house two inmates were supplied with two-tiered bunk beds.

As found by the district court, conditions in the units at issue in this case are very different. The facts already set forth make clear that the differences are substantial. One is particularly crucial. In *Rhodes* the district court found that there was no evidence that double celling caused greater violence. 452 U.S. at 343, 101 S.Ct. at 2397. In contrast, the district court in this case found that double-celling engenders violence, tension and psychiatric problems. That finding, along with others regarding cell conditions, clearly supports the double celling portion of the preliminary injunction. *See id.* at 349 n. 14, 101 S.Ct. at 2400 n. 14.[3]

## II. *Exercise*

The district court found that many of the inmates were confined to their cells for as much as 23½ hours a day. It concluded that the state's failure to provide sufficient exercise raised serious constitutional issues. In its preliminary injunction the court required the state to provide each prisoner with outdoor exercise. In *Spain v. Procunier,* 600 F.2d 189, 199–200 (9th Cir. 1979), we held that, on the facts presented, the denial of outdoor exercise constituted cruel and unusual punishment. Several factors present in *Spain* combined to make outdoor exercise necessary. The prisoners were in continuous segregation, spending virtually all their time in their cells; their contact with other persons was minimal; they lived in an atmosphere of fear and apprehension; and they were confined under degrading conditions without affirma-

---

**2.** Defendants argue that the district court erred by over-generalizing. They argue that fifteen separate confinement units are affected by the preliminary injunction but that the evidence of constitutional violations cited by the court in its findings of fact did not apply to all of the units. There is no merit to this argument. The court made findings as to the conditions at all three prisons affected by the preliminary injunction. The court did not abuse its discretion by failing to string cite references to each of the units after each of its findings.

**3.** We do not accept defendants' argument that, even if the district court's ban on double-celling is justified under current conditions, it is not justified under the conditions as ordered by the court. That argument goes only to the district court's finding that the practice of double-celling exacerbated the already bad cell conditions. It says nothing about the court's finding that in and of itself double-celling in these cells engenders violence. Moreover, if in the future conditions are shown to have changed as a result of the district court's order, defendants can apply for a modification of this injunction.

tive programs of training or rehabilitation. *Id.* We deemed it important that the inmates in question were not temporarily in segregation: they had already been there over four years. *Id.* at 200.

Similar findings were made in this case. Although the length of confinement in segregation varies, almost 1,000 inmates have been assigned to administrative segregation for over one year. Given those findings, the district court did not err in concluding that the denial of outside exercise raised a substantial constitutional question and that plaintiffs would probably succeed on the merits of that issue.

Defendants argue that the district court erred in requiring them to afford exercise beyond that required by their own regulations without holding those regulations unconstitutional. The state regulation governing inmate exercise requires less exercise than the preliminary injunction and permits indoor exercise. Cal.Admin.Code Tit. 15 § 3343(h). Defendants' argument misses the point. The district court did not invalidate the state regulation; it merely held that, given the circumstances of this case, the denial of outdoor exercise was probably unconstitutional. *See Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981) (comparing *Spain v. Procunier,* which required outdoor exercise where prisoners were otherwise confined in small cells twenty-four hours a day, with *Clay v. Miller,* 626 F.2d 345, 347 (4th Cir.1980), which did not require outdoor exercise where prisoners had access to dayroom eighteen hours a day).

### III. *Food Service*

■ The preliminary injunction provides that: "The types and quantities of food served shall be the same as that which is provided for general population inmates except that a sack lunch is permitted. All food shall be prepared, stored, and served under sanitary conditions." Defendants correctly point out that there is no factual support in the district court's findings for

that portion of the injunction. That portion of the court's order is vacated.

### IV. *Procedural Safeguards*

■ The district court found that despite the court's holding in *Wright I,* plaintiffs continue to be arbitrarily placed and retained in segregated housing. The court found that defendants were violating the *Wright I* court's injunction in various ways. Specifically, the court found that:

(1) prisoners continue to be placed in administrative segregation without any written reason for days well beyond the 48-hour requirement specified [in the state's] regulations[4]; (2) written explanation for placement in administrative segregation is often vague and conclusory in terms; (3) counsel-substitute (staff assistant) to aid in the preparation of the prisoners cases is often denied, even when assistance is clearly warranted; (4) access to investigating employees is often denied to prisoners; (5) investigating reports may be inadequate or not be received until after the hearing; and (6) explanations of reasons for the decision reached and references to the evidence in support of the decision are inadequate.

The court also found that the hearings which were provided were defective in various respects:

(1) the ten-day time limitation within which the prisoner must have his hearing, as mandated by [state] regulations, is often disregarded; (2) requests by inmates for witnesses are often denied without reason; (3) confidential information may be admitted without a showing as to its reliability beyond conclusory representations by officials, and (4) the prisoner may be involuntarily absent from the hearing or, as in one reported case, there may not even be a hearing.

In Part III of the injunction the district court imposed various procedural requirements to correct these practices. The court required every prisoner to be released from administrative segregation at the expira-

---

**4.** The regulation relied on was enacted in response to the *Wright I* injunction. As was the case with the other procedural safeguards vio-

lated by defendants, the court found the forty-eight-hour limit originated in the injunction.

tion of his minimum release date or twelve months of confinement, whichever is shorter, unless defendants were able to establish the prisoner's dangerousness at a hearing. The court specified the type of evidence which would be admissible at such a hearing as well as the criteria to be applied in determining whether to retain a prisoner in segregation.[5]

The remedy ordered in Part III does not, strictly speaking, correspond in all respects with the violations of the *Wright I* court's injunction found by the district court here. The court imposed a hearing twelve months down the line to remedy an arbitrary initial decision to segregate a prisoner. Part III does, however, serve as a readily enforceable check on defendants' power to violate the earlier injunction. The district court's order was a valid exercise of that court's power to effectuate the prior order of the three judge court in *Wright I.*[6] In fashioning a remedy for those violations the district court had the authority to go beyond earlier measures and enter a comprehensive order to insure against the risk of continued non-compliance. *Hutto v. Finney,* 437 U.S. 678, 687 & n. 9, 98 S.Ct. 2565, 2571 & n. 9, 57 L.Ed.2d 522 (1978); *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982)[7].

**5.** Part III of the injunction provides in part:
  1. A prisoner shall be released from administrative segregation in a security housing unit at the expiration of his Minimum Eligible Release Date or at the expiration of twelve (12) months of consecutive confinement in security housing units, whichever is shorter, unless, before said period expires, he is afforded all the hearing rights that attend a prisoner's initial placement in administrative segregation and defendants show at such hearing, on the basis of the prisoner's behavior, that his release would severely endanger the lives of inmates or staff or the security of the institution. Such behavior shall be factually documented or based on reliable information as set forth in this section . . . . A prisoner shall not be involuntarily retained in any other administrative segregation unit unless, before the expiration of twelve (12) months of consecutive confinement, he is afforded all the hearing rights that attend a prisoner's initial placement in administrative segregation and unless at this hearing defendants show that release of the prisoner from segregation would endanger the prisoner's own safety or the safety of others; or that release would jeopardize the integrity of an investigation into suspected criminal activity or serious misconduct. If the decision is based, in whole or in part, on gang membership, membership must be proven by reasonably convincing evidence of present and active allegiance to a gang.

**6.** Because we hold part III of the injunction to be a valid exercise of the court's power to enforce a previously issued injunction, we need not address the court's independent conclusion that defendants' practices violate both the eighth and fourteenth amendments. We note, however, that in and of itself, misclassification is not a violation of the eighth amendment. *Hoptowit v. Ray,* 682 F.2d 1237, 1256 (9th Cir. 1982). Even an indeterminate sentence to punitive isolation does not without more constitute cruel and unusual punishment. *Hutto v. Finney,* 437 U.S. 678, at 686, 98 S.Ct. 2565, at 2571, 57 L.Ed.2d 522 (1978); *Gibson v. Lynch,* 652 F.2d 348, 352 (3d Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 3123, 77 L.Ed.2d 1375 (1983).

  Moreover, *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) casts some doubt on the court's conclusion that defendants' practices violate the fourteenth amendment. In *Hewitt* the court held that an informal, non-adversary evidentiary review is sufficient to support an inmate's placement in administrative confinement. Moreover, the court acknowledged the prison administrators' need to base their decisions on generalized information.
  In the volatile atmosphere of a prison, an inmate may easily constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, . . . turns largely on "purely subjective evaluations and on predictions of future behavior, . . ."
*Id.* at ——, 103 S.Ct. at 873 (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981)). In passing on plaintiffs' request for a permanent injunction the district court may wish to reconsider its evaluation of plaintiffs' procedural claims and, if necessary, decide whether the evidence continues to warrant imposition of the procedural requirements adopted to insure compliance with the *Wright I* court's injunction.

**7.** The issue before the district court was simply whether the *Wright I* order had been violated. Thus, it was not necessary to reconvene a three judge court. *See Commission v. Brashear Lines,* 312 U.S. 621, 625, 61 S.Ct. 784, 786, 85 L.Ed. 1083 (1941). *Hamilton v. Nakai,* 453 F.2d 152, 160–61, (9th Cir.), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 332 (1972).

## V. Abstention

Defendants argue that the district court should have abstained from exercising jurisdiction in this case. In *Manney v. Cabell,* 654 F.2d 1280 (9th Cir.1980), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982), we vacated a district court judgment because the court exercised jurisdiction over an action challenging conditions at Central Juvenile Hall in Los Angeles.

In *Manney* we concluded that the three exceptional circumstances required for application of the *Pullman* doctrine (*Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)) were present. The complaint touched on a sensitive area of social policy into which the federal courts do not lightly intrude. In addition to alleging federal constitutional violations, the complaint asserted that the conditions complained of violated two unusual state statutes which required the state to provide "custody, care, and discipline as nearly as possible equivalent to that which should have been given by [the juvenile's] parents." Cal.Welf. & Inst.Code § 202(a). The detention center was to "be conducted in all respects as nearly like a home as possible." *Id.* at § 851. Because we were uncertain how the California courts would construe these provisions, we decided to postpone constitutional adjudication, pending state decision.

■ No such unusual statutes are involved in this case. Although the district court did discuss several state law provisions, the rights claimed to have been violated are plainly federal in origin and nature. The fact that state law is also implicated does not require the district court to abstain. *See Ramos v. Lamm,* 639 F.2d 559, 564 & n. 5 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). The decision whether to abstain "involves a 'discretionary exercise of a court's equity power,' the propriety of which [must] be determined on a case-by-case basis." *Manney,* 654 F.2d at 1284 (quoting *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964)). Abstention is not favored in section 1983 cases. *Canton v. Spokane School District No. 81,* 498 F.2d 840, 845–46 (9th Cir.1974). The district court did not err in refusing to abstain here.

## VI. Pendent Jurisdiction

■ Defendants argue that the district court erroneously exercised pendent jurisdiction as an excuse to broaden the scope of its review beyond that permissible under the eighth or fourteenth amendments. Noting that many of the conclusions of law track state law provisions, defendants argue that the court used pendent jurisdiction as a means to return to a "totality of conditions" approach and assume control of the prisons.

We disagree. Although the district court did rely in part on state law provisions, it based its conclusions of law on federal constitutional standards. As we directed in *Wright II,* 642 F.2d at 1132–33, the court simply relied on state law provisions, as well as expert opinions and professional standards, as aids in determining whether contemporary standards of decency had been met. *See, e.g., Ramos,* 639 F.2d at 567 n. 10. The court did not apply a "totality of conditions" approach. It considered the separate conditions of confinement and found that they violated the eighth amendments proscription of cruel and unusual punishment. In some cases the court necessarily took into account the effect of other conditions on the condition under consideration. Conditions of "confinement [do] not exist in isolation; [a] court must consider the effect of each condition in the context of the prison environment, especially when the ill effects of particular conditions are exacerbated by other related conditions." *Hoptowit,* 682 F.2d at 1247. Finally, the district court carefully considered the impact of its order on security conditions, as well as the cost of carrying the order out. Its findings on those points are not clearly erroneous.

## CONCLUSION

The district court did not abuse its discretion in concluding that the conditions it found to exist at the institutions affected

by its preliminary injunction were of doubtful constitutionality, that the plaintiffs would probably succeed on the merits, and that the balance of hardships tipped sharply in their favor. However, the district court failed to enter findings to support its order regarding food service. We, therefore, AFFIRM all but the food service portion of the preliminary injunction.[8]

AFFIRMED IN PART AND VACATED IN PART.

---

**8.** On May 27, 1983, defendants filed a motion to strike the brief for amici curiae, the Bar Association of San Francisco and the San Francisco's Lawyer's Committee for Urban Affairs. That motion is denied.