Robert P. **SHELEY**, Petitioner–Appellant,

v.

Richard L. **DUGGER**, Robert A. Butterworth, Respondents–Appellees.

No. 85–3636.

United States Court of Appeals, Eleventh Circuit.

Nov. 20, 1987.

Timothy J. Corrigan, Jacksonville, Fla., for petitioner-appellant.

Ken McLaughlin, and J. Craig Myrick, Asst. Attys. Gen., Tallahassee, Fla., for respondents-appellees.

Before CLARK, EDMONDSON and KEITH *, Circuit Judges.

PER CURIAM:

The panel has *sua sponte* reconsidered its opinion in this case filed on August 21, 1987, and appearing at 824 F.2d 1551. That opinion is hereby withdrawn and vacated and the following opinion is substituted in lieu thereof.

Robert Sheley appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Sheley, an inmate at the Florida State Prison, has been confined in close management (CM) solitary confinement for over twelve years.

This appeal raises three issues: (1) whether Sheley's continued confinement in CM violates his constitutional rights to due process; (2) whether Sheley's continued confinement in CM violates his constitutional rights to equal protection; and (3) whether Sheley's continued confinement in CM constitutes cruel and unusual punishment. Because we find that we cannot adequately address Sheley's claims on the basis of the record before us, we reverse and remand to the district court for an evidentiary hearing.

## I. FACTS

Sheley is a Florida state prisoner serving a life sentence for robbery and possession of a firearm by a felon. He is also serving a concurrent sentence of thirty-seven years for various other crimes (including assault with intent to commit murder, shooting into a motor vehicle, and aggravated assault)

and a consecutive ten-year sentence for escape.

Sheley attempted to escape from the Shands Teaching Hospital in Florida in 1973, but he was not able to get away. He had more success on his next try. On February 28, 1974, he escaped from the Union Correctional Institution and remained at large until his capture on March 6, 1974. On May 7, 1974, Sheley again attempted to escape, this time from the Osceola County Jail. When he arrived at the Florida State Prison in June of 1974, Sheley was placed in administrative confinement pending the investigation of the attempted escape from the reception and medical center. On January 30, 1975, various escape items were found in Sheley's stomach and rectum. The prison classification team [1] thereafter recommended that Sheley be placed in CM because he was an extreme escape risk. After this recommendation was approved by the assignment team in March of 1975, Sheley was placed in CM. On June 27, 1977 a .22 caliber revolver and thirty rounds of ammunition were found in Sheley's cell. In July of 1980, Sheley received a disciplinary report for the offense of possession of negotiables. He has received no disciplinary reports since that time.

Except for the 1974 escape, Sheley disputes all of the charges of misconduct. He asserts that, aside from the disciplinary action taken in 1975 with regard to the possession of escape paraphernalia, he was never charged or disciplined for any of the attempted escapes or other charges alleged in the Department of Corrections' status reports. Petitioner's Brief at 7-8.

With the exception of certain time spent in disciplinary confinement, Sheley has been confined in CM continually since March of 1975. Sheley's status has been reviewed from time to time during the

---

* Honorable Damon J. Keith, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. The classification team makes an initial recommendation as to a prisoner's detention status (i.e., whether he should be placed in confinement, kept in confinement, or returned to the general prison population). The assignment team, which makes the final decision of a prisoner's detention status, is not bound by the classification team's recommendation.

years he has been confined in CM. On all but one occasion prior to 1980, the classification team recommended that Sheley remain in CM because he was an extreme security and escape risk. On three occasions in 1980 and one occasion in 1982 the classification team recommended that the assignment team place Sheley into the general prison population. In each case, however, the assignment team determined that Sheley should stay in CM because he remained a severe escape risk.

In May of 1983, Sheley filed a pro se petition for a writ of habeas corpus in the state courts challenging his confinement in CM. The trial court denied the petition, and the Florida First District Court of Appeal, in a per curiam order, affirmed. Record, Vol. 2 at Tab 12. He then filed a pro se petition for a writ of habeas corpus in the district court, alleging that the prison procedures retaining him in CM denied him due process and equal protection, and that his long-term confinement in CM constituted cruel and unusual punishment.[2] The state filed a response asserting that: (1) Sheley was a security risk because of a prior escape, several attempted escapes, and his possession of a revolver inside the prison; (2) Sheley did not have a liberty interest prior to 1981, when Fla.Admin. Code § 33–3.081 was enacted; (3) Sheley was afforded periodic reviews of his CM status, including an opportunity to present his views to the reviewing committees; (4) Sheley's equal protection and Eighth Amendment claims were meritless; and (5) the assignment team's disapproval of the classification team's recommendations that Sheley's status be changed did not violate state administrative rules and was supported by substantial evidence. *Id.*

On May 7, 1985, the magistrate, without having conducted an evidentiary hearing, entered a report and recommendation dismissing Sheley's habeas petition. He found that Sheley had a liberty interest in remaining in the general prison population, that Sheley's CM status had been reviewed on a regular basis, that the hearing procedure set out by Fla.Admin.Code § 33–3.0083(f) (Supp.1985) was followed each time Sheley's status was evaluated, and that this procedure comported with due process requirements. The magistrate also found that Sheley's equal protection and cruel and unusual punishment claims were meritless because Sheley failed to state sufficient facts. The district court, over Sheley's objections, adopted the magistrate's report and denied habeas relief.

## II. DISCUSSION

### A. *Introduction*

On repeated occasions, the Supreme Court has stated that the decisions of prison authorities should be given great weight. *See, e.g., Rhodes v. Chapman,* 452 U.S. 337, 351–52, 101 S.Ct. 2392, 2401–02, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish,* 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). A court's function is not to decide "how best to operate a detention facility," especially where internal security is concerned. *Rhodes,* 452 U.S. at 349 n. 14, 101 S.Ct. at 2400 n. 14; *see also Bell,* 441 U.S. at 546–47, 99 S.Ct. at 1878 (noting the importance of internal security to correctional goals).

This deference does not mean, however, that courts must abstain from reviewing the constitutional claims of prisoners. "[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Thus, " 'it is [a court's] duty, when jurisdiction is properly invoked, to protect prisoners' rights.' " *Hamm v. DeKalb County,* 774 F.2d 1567, 1571 (11th Cir.1985) (quoting *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir. Jan. 1981) (en banc)), *cert. denied,* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). With these principles in mind, we turn to Sheley's claims.

---

**2.** Sheley proceeded pro se in the district court, as his request for appointment of counsel was denied. We appointed counsel for Sheley soon after his appeal was filed.

## B. *Procedural Due Process*

The Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Sheley alleges that his continued confinement in CM deprived him of liberty without affording him procedural due process because his status was not periodically reviewed and because he was not given an opportunity to present his views to prison officials charged with determining his status.

### 1. Sheley's Liberty Interest

We begin our analysis of the procedural due process claim by determining whether Sheley has a protected liberty interest in being placed in the general prison population. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983).

In *Hewitt*, the Supreme Court held that the due process clause of the Fourteenth Amendment did not create "an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters." *Id.* at 466, 103 S.Ct. at 869. The Court found, however, that Pennsylvania, in enacting guidelines for the use of administrative segregation, had created such a liberty interest: "[Pennsylvania] has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.' ... [W]e are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that [Pennsylvania] has created a protected liberty interest." *Id.* at 471–72, 103 S.Ct. at 871.

The Florida Department of Corrections' rules are similar to those at issue in *Hewitt*. The administrative confinement rules, for example, provide that an inmate can be placed in administrative confinement only for certain reasons: if "disciplinary charges or criminal charges" are pending against the inmate and the "presence of the inmate in the general population would present a clear danger;" if an "investigation is pending and the presence of the inmate in the general prison population might interfere with that investigation;" if the inmate would create a risk because of medical (including psychiatric) reasons; or if the "facts clearly indicate that the inmate must be removed from the general inmate population for the safety of any [persons] or for the security of the institution." Fla.Admin.Code Ann. § 33–3.0081(a)(a)–(d) (Supp.1985). The rules also state that: "administrative confinement *shall be* for the shortest period of time necessary," *id.* at § 33–3.0081(3) (emphasis added); the reason for placement "*shall be* explained to the inmate, and he *shall be* given an opportunity to present his views," *id.* at § 33–3.0081(4)(a) (emphasis added); and a "formal evaluation report *shall be* required" if the inmate is kept in administrative confinement for more than thirty days, *id.* at § 33–3.0081(6)(a) (emphasis added). Likewise, the close management rules provide that an "inmate placed in [CM] *shall be* given a hearing" before a review team, *id.* at § 33–3.0083(4)(a) (emphasis added); that the review team "*shall inform* the inmate of the basis for its decision," *id.* at § 33–3.0083(4)(b) (emphasis added); that a "formal evaluation report *is required* on inmates in [CM] each 30 days," *id.* at § 33–3.0083(6)(d); and that the "goal of the Close Management Review Team *shall be* toward returning the inmate to open population as soon as the facts of the case suggest it can be safely done," *id.* at § 33–3.0083(6)(e) (emphasis added).

■ We find that the mandatory language and substantive predicates in the Department of Corrections' rules and regulations concerning administrative segregation and close management create for inmates a liberty interest in remaining in the general prison population. Our conclusion

is buttressed by *Parker v. Cook*, 642 F.2d 865 (5th Cir. Unit B Apr.1981).[3] In that case, which also involved administrative segregation in a Florida institution, we stated: "Regardless of what the state chooses to call the confinement to which plaintiff was subjected, the fact remains that the state, through regulation if not practice, had granted plaintiff a liberty interest in being free from arbitrary transfers from the general [prison] population to disciplinary segregation." *Id.* at 875; *see also Granger v. Florida State Prison*, 424 So.2d 937, 938 (Fla.Dist.Ct.App.1983) (Fla. Admin.Code § 33–3.081 (the predecessor to § 33–3.0081) created a "liberty interest in being free from arbitrary transfers from the general prison population to administrative segregation"); *accord Toussaint v. McCarthy*, 801 F.2d 1080, 1097–98 (9th Cir. 1986) (California prison regulations gave prisoners a liberty interest in remaining in or returning to general prison population), *cert. denied*, —— U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Clark v. Brewer*, 776 F.2d 226, 230–32 (8th Cir.1985) (Iowa Department of Corrections' policies, promulgated to address close management setting, gave inmates a protected liberty interest in remaining in or returning to the general prison population).[4]

## 2. The Process Afforded Sheley

The second part of our inquiry entails determining whether the process afforded Sheley satisfied the minimum requirements of the due process clause. *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871. An inmate facing *disciplinary charges* for misconduct must be accorded 24 hours' advance written notice of the charges against him, a right to call witnesses and present documentary evidence in defense unless so doing would jeopardize institutional safety or correctional goals, the aid of a staff member or inmate in presenting a defense provided the inmate charged with misconduct is illiterate or the issues are complex, an impartial tribunal, and a written statement of the reasons relied upon by the tribunal. *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974). In contrast, an inmate facing a transfer to administrative segregation pending completion of an investigation of misconduct charges against him need only be given an informal, nonadversary review. He "must merely receive some notice of the charges against him and an opportunity to present his views to the prison *officials charged with deciding whether to transfer him to administrative segregation.*" *Hewitt*, 459 U.S. at 476, 103 S.Ct. at 874 (emphasis added). The decision-maker in

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**4.** Sheley's liberty interest dates back to 1974. At that time, CM was a form of administrative confinement, and the Department of Corrections' rules provided that: (1) a written report stating the reason for an inmate's transfer to administrative confinement "*must ... be completed;*" (2) the placement of an inmate in administrative confinement "*will be reviewed* by the Classification Team and approved by the Superintendent;" and (3) "inmates in administrative confinement *will be reviewed* by the Classification Team for possible release at regular intervals." *Adams v. Wainwright*, 512 F.Supp. 948, 950–51 (N.D.Fla.1981) (quoting Florida Division of Corrections Inmate Treatment Directive Number 5, issued October 16, 1974, ¶ 5.12). The rules also delineated eight reasons why an inmate could be placed in administrative confinement, and provided that the team reviewing an inmate's administrative confine-

ment was to meet with the inmate whenever a reclassification or progress report was being prepared. *Id.* at 951, 953 (quoting Inmate Treatment Directives 5 & 8). Although the directives were modified over the years, they continued to contain the same type of mandatory language. *See, e.g.,* Record Excerpts, Tab 18 at PA–15–23 (Florida State Prison policy memorandum dated July of 1978 setting forth the procedures for placement and retention of inmates in administrative confinement); *id.* at PA–24–28 (Florida State Prison policy directive dated August of 1977 defining close management status and outlining procedures for the placement and release of inmates in that status); *see also* Fla.Admin. Code § 33–3.081 (1981). Thus, like the district court in *Adams*, we hold that these rules and directives created a liberty interest by "creating a justifiable expectation in an inmate that he [would] not be placed in administrative confinement absent a finding that he [fell] into one of the enumerated categories," 512 F.Supp. at 953, and by requiring that his administrative segregation or CM status be reviewed regularly.

such a case must "review the charges and then-available evidence against the [inmate]." *Id.*

Sheley was initially placed in CM in March of 1975, and has remained there for the past twelve years. Unlike the inmate in *Hewitt,* Sheley is not challenging the procedures employed in initially placing him in CM. Rather, he attacks as unconstitutional the procedures used by the Florida Department of Corrections in reviewing his lengthy, uninterrupted, and potentially indefinite[5] segregation in CM.

To determine whether Sheley was denied due process, we must apply a three-part balancing test in which we weigh "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872 (citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). Dicta in *Hewitt* alludes to the process required in the type of situation involved in this case:

> Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

*Id.* 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9.

In *Mims v. Shapp,* 744 F.2d 946 (3d Cir.1984), an inmate who had been kept in administrative confinement[6] for five years alleged that his continued confinement in segregated quarters violated his due process rights. The prison authorities had reviewed the inmate's segregation status every thirty days, and had consistently recommended that the inmate remain in segregation for another thirty days. The prison warden had approved the recommendations every time. *Id.* at 949, 952. After stating that the language in *Hewitt* concerning the review of continued administrative confinement was "instructive," the Third Circuit applied the three-part *Mathews* test and held that the monthly reviews had afforded the inmate due process.[7] The court found that the state had a heightened governmental interest in safety given the inmate's two murders, and that the inmate, because of the "potentially limitless duration" of administrative segregation, had a "more significant liberty interest for due process analysis than that attributed to the prisoner in *Hewitt.*" *Id.* at 951–52. It recognized that determining the "adequacy of the periodic review procedures [was] a difficult task," and emphasized the narrowness of its holding by stating that it was "strongly influenced by the specific conduct of the inmate ... which heightened the governmental interest in restricting his liberty." *Id.* at 952.

In addition to the Third Circuit, other courts have addressed the adequacy of review procedures for continued administrative confinement. *See Toussaint,* 801 F.2d at 1101 (annual review of prisoner's administrative confinement status did not satisfy due process); *Clark,* 776 F.2d at 234 (conducting a hearing every seven days for the

---

**5.** "Close Management is a *long-term* single cell confinement of an inmate apart from the general [prison] population." Fla.Admin.Code Ann. § 33–3.0083(1) (Supp.1985) (emphasis added).

**6.** The inmate, who had been originally convicted of killing a policeman, had been placed in administrative confinement for murdering a deputy warden while in prison. *Mims,* 744 F.2d at 948.

**7.** It should probably be noted that the inmate in *Mims* had been placed back in the general prison population by an order of the district court, and that the state did not challenge the propriety of that injunctive relief on appeal. *Mims,* 744 F.2d at 949. Thus, the Third Circuit was not faced with an inmate like Sheley who was still in administrative confinement.

first two months of administrative confinement and monthly reviews thereafter satisfied due process).

Sheley's situation is unlike that of the inmates in *Toussaint, Mims,* or *Clark.* The inmates in *Mims* and *Clark* were released from administrative confinement after five years and seven years respectively. *See* 776 F.2d at 229; 744 F.2d at 948–49. *Toussaint* involved a class action on behalf of 2,000 prisoners confined in administrative segregation in four California state prisons. *See Toussaint v. Yockey,* 722 F.2d 1490, 1491 (9th Cir.1984). Sheley is into his twelfth year in CM, and he alleges that since 1977 the reviewing teams have not relied on any new evidence to keep him segregated. This raises the possibility that Sheley is being disciplined for prior conduct. As we have previously stated, "we think it self-evident that the State of Florida cannot, by merely attaching the label of administrative segregation to its actions, transform what is in substance disciplinary action subject to due process restrictions into administrative action outside the purview of the due process clause." *Parker,* 642 F.2d at 875.[8]

■ Even if his segregation is not punitive in nature, Sheley's due process claim must be evaluated on its own facts. The requirements of due process are "flexible and variable dependent upon the particular situation being examined." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979).

■ Unfortunately, on the basis of the record before us, we cannot address Sheley's procedural due process claims. Because the state decided to provide only a "representative sample" of the review of Sheley's confinement in CM, *see* Response to Petition for Writ of Habeas Corpus, Record, Vol. 2 at Tab 12, the record is not sufficiently complete or specific with regard to the review that Sheley received. In its present form, the record indicates that Sheley's status was reviewed thirty-

three times in a ten-year period, that Sheley was "interviewed" by somebody on twenty-two of those occasions, that the classification team recommended on five occasions that Sheley be returned to the general prison population, and that all five of those recommendations were denied. Record, Vol. 1, Tab 12 at A112–A146. Although the record does not indicate that monthly reviews took place, a report dated January 23, 1984 states that Sheley's case has been reviewed on a monthly basis. If monthly reviews have taken place, however, it is unclear when they began. A reclassification and progress report dated May 15, 1975 states that Sheley's next review was scheduled for November of 1975, six months later, and a report dated June 14, 1976 states that Sheley's next review was scheduled for May of 1977, eleven months later. Record, Vol. 2, Tab 12 at A117–A120. In any event, Sheley alleges that he was not present at the reviews and did not receive notice of them, that he did not have an opportunity to present arguments on his behalf, and that the assignment team denied the recommendations that he be removed from CM without holding a hearing or explaining its reasons. Petitioner's Brief at 8–12, 17. The latest correspondence between Sheley and prison officials indicates that Sheley was told in May of 1986 that the assignment team would review his CM status in September of 1986. Although Sheley was kept in CM, it is unclear from the correspondence whether Sheley saw any of the assignment team members when his case was reviewed at that time. Supp. Record, Vol. 1 at 4. Given the possibility that Sheley may remain in CM for the rest of his prison sentence, we cannot adjudge his procedural due process claim on the incomplete and apparently conflicting record before us.

We therefore remand the case to the district court for an evidentiary hearing. *See Demps v. Wainwright,* 805 F.2d 1426, 1433 (11th Cir.1986) (a federal court must grant an evidentiary hearing to a habeas

---

**8.** If Sheley's confinement in CM is disciplinary, he must be afforded the type of procedures set out in *Wolff.*

petitioner if the merits of the factual dispute were not resolved at the state hearing, the state factual determination is not fairly supported by the record as a whole, or the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing). Now that Sheley has appointed counsel who can undertake discovery, the district court can provide the parties with a meaningful evidentiary hearing if the case cannot be disposed of through summary judgment.[9]

## C. Substantive Due Process and Equal Protection

■ Sheley alleges that the arbitrary actions of the prison officials in keeping him in CM violated his substantive due process rights. He also claims that he was denied equal protection because other prisoners with worse disciplinary records had been released from CM after much shorter periods of confinement. Because these two claims appear to be intertwined with the procedural due process claim, the evidence presented at the evidentiary hearing on the procedural due process claim will be relevant to them. We therefore do not address the substantive due process and equal protection claims at this time.

## D. Cruel and Unusual Punishment

### 1. Sheley's Allegations

Sheley contends that his continuous confinement in CM status for twelve years constitutes cruel and unusual punishment. He asserts that CM is essentially punitive, that the length of his confinement in CM is entirely disproportionate to any offense he may have committed, and that the conditions of confinement in CM inflict unnecessary pain and suffering. He alleges that he is completely idle in CM, and that this isolation has resulted in mental and physical deterioration. Sheley asserts that CM inmates are confined to their cells, which are approximately six feet by eight feet, twenty-four hours a day, seven days a week except for a five-minute shower three times a week, "limited out-side exercise, if any, and an occasional call out." He claims that it is difficult to get needed medical attention, that access to legal material is minimal, that visits are severely restricted, and that he cannot have a job or participate in vocational programs. He also claims that his canteen and money-withdrawal privileges are restricted, that he is not permitted to have a radio or television, and that he is ineligible for parole.

The state does not challenge Sheley's factual assertions. In fact, the pertinent Florida administrative rules indicate that Sheley's claims about the conditions of confinement in CM are fairly accurate, except that the rules provide for daily access to medical care, access to legal materials, and out-of-cell exercise for two hours per week. See Fla.Admin.Code Ann. § 33–3.0083 (Supp.1985).

### 2. Eighth Amendment Standards

The Eighth Amendment prescribes punishment that shocks the conscience, offends society's evolving notions of decency or is grossly disproportionate to the offense. Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–71, 57 L.Ed.2d 522 (1978). It also forbids inflictions of pain which are " 'totally without penological justification.' " Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

It is clear that administrative segregation and solitary confinement do not, in and

---

**9.** Although we do not rely on it, the process afforded by the current rules of the Florida Department of Corrections bolster our decision to remand for an evidentiary hearing. Those rules provide that the CM status of an inmate is to be reviewed every week for the first two months and at least every thirty days thereafter. If an inmate is confined to CM more than thirty days, the superintendent "shall review the decision of the close management review team at least once every thirty days." In addition, a formal evaluation report is required on inmates in CM every thirty days. The report, which may be in brief paragraph form, is to detail the basis for confinement, what has transpired since the last report, the decision concerning continued confinement and the basis for the decision. Fla.Admin.Code Ann. § 33–3.0083(6)(a)–(d) (Supp.1985). Based on the incomplete record, it is impossible for us to tell whether Florida's own rules regarding the review of a prisoner's CM status have been followed.

of themselves, constitute cruel and unusual punishment. *Hutto,* 437 U.S. at 686, 98 S.Ct. at 2571. Because Sheley apparently has adequate food, clothing, and sanitation, the conditions of his confinement in CM do not on their face violate the Eighth Amendment. *See Dorrough v. Hogan,* 563 F.2d 1259 (5th Cir.1977), *cert. denied,* 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 153 (1978); *cf. Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977) (state's obligations under Eighth Amendment end if it furnishes its prisoners with reasonably adequate food, clothing, sanitation, medical care, and personal safety), *rev'd in part on other grounds sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam).

The Supreme Court has cautioned, however, that "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards." *Hutto,* 437 U.S. at 686, 98 S.Ct. at 2571.[10] In reviewing the Eighth Amendment claims of prisoners confined in segregation, federal courts of appeals have recognized that the length of time in isolation is a factor which must be considered. *See, e.g., Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980); *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 861 (4th Cir. 1975) (en banc); *O'Brien v. Moriarty,* 489 F.2d 941, 944 (1st Cir.1974). As the First Circuit recently stated,

> Although depression, hopelessness, frustration, and other such psychological states may well prove to be inevitable by products of lifelong incarceration, the threat of substantial serious and possibly irreversible if not critical psychological illness together with prolonged or indefinite segregated confinement would increase the burden on prison authorities to explore feasible alternative custodial arrangements.

*Jackson v. Meachum,* 699 F.2d 578, 584–85 (1st Cir.1983). Similar concerns were voiced by the Ninth Circuit:

> The deprivations associated with an institutional lock-up, including twenty-four hour confinement, and curtailment of all association, exercise and normal vocational and educational activity, may constitute a due process violation, as well as a violation of the Eighth Amendment, if they persist too long.

*Pepperling v. Crist,* 678 F.2d 787, 789 (9th Cir.1982); *see also Meriwether v. Faulkner,* 821 F.2d 408, 416–17 (7th Cir.1987) (it is "more troubling to extend" a holding that prisoners in administrative confinement do not have the same right of access to vocational, academic, and rehabilitation programs as regular prisoners do "to an inmate who is required to serve a thirty-five year sentence in segregation"); *Sweet,* 529 F.2d at 866 (restriction of two one-hour exercise periods each week for prisoners in segregation may transgress the Eighth Amendment if the restriction "has extended over a period of years [three and a half] and is likely to extend indefinitely for the balance of plaintiff's confinement").

■ Sheley's case is unique because of his long period of segregation. While we have been hesitant in the past to apply the Eighth Amendment to claims of physical and mental deterioration by prisoners in the general prison population, *see Newman,* 559 F.2d at 291, Sheley's twelve-year confinement in CM raises serious constitutional questions. In addition to the mental and physical deterioration he alleges, Sheley's Eighth Amendment claim is supported, at this stage of the litigation, by his contention that his confinement in CM is punitive in nature. If the segregation is punitive, it should be determined whether it shocks the conscience, is grossly disproportionate to the offense, or is totally without penological justification. *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399; *Hutto,* 437 U.S. at 685, 98 S.Ct. at 2570–71.

■ As with Sheley's other claims, however, we cannot decide the Eighth Amendment issue at this time. Because no evidence on the Eighth Amendment claim has been presented, we remand to the district court for an evidentiary hearing at which both sides may present evidence on the reasons for Sheley's segregation, the condi-

---

**10.** *Newman* was decided before *Hutto.*

tions in CM, the effects of long-term confinement in CM, the psychological evaluations (if any) that Sheley has received, and the possibility of feasible alternatives.[11] *See Demps,* 805 F.2d at 1433; *see also Meriwether,* 821 F.2d at 417 (it was premature for the district court to dismiss the Eighth Amendment claims of an inmate facing prolonged confinement in segregation "without ascertaining the actual conditions of [the inmate's] confinement and the existence of any feasible alternatives"); *cf. Sweet,* 529 F.2d at 866 ("We accordingly feel constrained because of the extended period of time of plaintiff's confinement in maximum security to remand the case to the district court in order that it may take additional testimony and consider in greater detail whether the health of the plaintiff may be adversely affected by the restricted exercise rights accorded him.").

### III. CONCLUSION

We express no views on the merits of any of Sheley's claims. We simply find that we cannot adequately address the claims without the benefit of more facts. The decision of the district court denying Sheley's petition for a writ of habeas corpus is reversed and the case is remanded with instructions to hold an evidentiary hearing for the purpose of addressing Sheley's claims.

REVERSED and REMANDED.

EDMONDSON, Circuit Judge, dissenting:

For the reasons I previously stated in *Sheley v. Dugger,* 824 F.2d 1551, 1558 (11th Cir.1987), I dissent. We are reviewing for error a specific judgment of a district court. The record showed the district court that Sheley's confinement status had been periodically reviewed. *Sheley,* 824 F.2d at 1563 n. 10. The uncontested physical conditions of Sheley's confinement sat-

isfy the Eighth Amendment. *Id.* at 1564. These were the critical points. Accordingly, what was important for the district court to know was before it; the record before the court was complete enough to show that Florida had met the requirements of the federal Constitution.

The prison officials' reports show that Sheley is an intelligent, manipulative, dangerously violent man with a history of repeated escape attempts and a future of imprisonment for many years. They forecast an escape attempt if Sheley were placed where such an attempt might be possible. Whatever our own views may be, the record before the district court lends ample support to the views of the prison officials charged with the important duty to keep their facility secure. We ought not to interfere in this matter. I would affirm the judgment of the district court.

---

**11.** We note in passing that Florida recognizes the possible harm that can result from continued confinement in CM. The Department of Corrections' rules provide that an inmate assigned to CM for more than thirty days is to be given a psychological assessment, which includes a personal interview, every ninety days.

After reviewing each psychological assessment report, the prison superintendent is to determine whether the inmate is to remain in CM. Fla.Admin.Code § 33–3.0083(6)(c) (Supp.1985). The record does not indicate, and the state does not contend, that these assessments have been conducted for Sheley.