John W. McQUEEN,
Plaintiff–Appellant,

v.

J.A. TABAH, W.D. Dixon,
Defendants–Appellees.

No. 87–3172.

United States Court of Appeals,
Eleventh Circuit.

March 18, 1988.

John W. McQueen, pro se.

Jane A. Lester, Jacksonville, Fla., for plaintiff-appellant.

Robert A. Butterworth, Atty. Gen., Carl J. Zahner, Robert Parson, Susan A. Maher, and Martha Olive Rowland, Asst. Attys. Gen., Tallahassee, Fla. for defendants-appellees.

Before HILL and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal from the granting of a motion for summary judgment for defendant prison officials in a prisoner's Section 1983 action.

## I. STATEMENT OF THE CASE

Plaintiff John W. McQueen was an inmate at the Union Correctional Institution in Florida who has subsequently completed his sentence. He claims that his Fourteenth Amendment right to due process of law was violated in connection with his confinement for a period of 11 months in "close management" solitary confinement while in the prison. McQueen sought compensatory damages from defendants-appellees, J.A. Tabah, a classification specialist, and W.C. Dixon, a correctional officer at the prison.

Appellees filed a motion to dismiss or motion for summary judgment, claiming that McQueen had failed to state a claim upon which relief could be granted, and alternatively asserting both absolute and qualified immunity. Their motion for summary judgment was supported by an affidavit by Dixon to which McQueen responded with two affidavits. The district court entered an order granting appellees' motion for summary judgment, accompanied by an opinion in which the district court held that the due process clause, in and of itself, was not implicated by McQueen's continued confinement in close management, and that McQueen failed to establish that he was deprived of a protected liberty interest without due process by being compelled to *remain* on close management status.

This appeal followed. This Court appointed counsel to represent McQueen and file a supplemental brief on his behalf.

## II. STATEMENT OF THE FACTS

The record is devoid of many of the facts necessary to a final decision of this case. To illustrate, appellant states that on October 19, 1984, appellee Tabah recommended McQueen for close management 1 status and the close management review team determined that McQueen be placed on close management 1 status "for a period of observation." Yet, to his complaint under Section 1983, McQueen attaches a copy of a "grievance" or request he made to the superintendent of the correctional institution seeking release to the general population. This document was signed on February 24, 1985. In the request, he stated: "I have been locked up for over 11 months without any writeups of any kind." This would indicate that McQueen had already been on close management several months before Oct. 19, 1984. The record discloses that on March 18, 1985, the prison officials, acting as the review team, granted his request by stating that appellee Tabah "reports that you will be considered for release (to population) on March 21, 1985."

The record is silent as to whether McQueen had any more information about the March 21, 1985 proceedings until after they were concluded. There is no indication in the record that McQueen was present at the hearing, although other facts in the record indicate that he was not present. This appears from the fact that McQueen alleged that appellees Tabah and Dixon told him they had appeared before the review team and convinced the team not to allow McQueen's release to the open population.

At the time McQueen was placed in close management 1, he was suspected of having been in possession of a knife and of having stabbed another inmate Jenkins. The record shows that McQueen was tried in the state criminal court for the alleged stabbing and possession of a knife while in

prison and had been acquitted of both charges. The record is silent as to any reviews or investigations made of McQueen's status in close management between October 19, 1984 and his grievance in February 1985 or after the decision by the review team to keep him in close management. Nor does the record show whether he remained in close confinement until he was released at the end of his term of imprisonment on June 1, 1987. The only allegation, however, that he was held in CM status without review was for the period of 11 months, which he made in his grievance request in March, 1985.

## III. THE ISSUE

The issue before us on appeal in light of the trial court's decision is whether a genuine issue of material fact exists as to whether McQueen's continued confinement in close management without reviews required by the Florida prison regulations violated his substantive or procedural due process rights such that appellees are not entitled to a summary judgment as a matter of law.

## IV. DISCUSSION

The plaintiff's rights in this case, if any, depend upon the Florida prison regulations dealing with close management (CM). They also depend on the functions, duties and action of the classification team and of the close management review team.

### (1) *Rules and Regulations*

This Court has recently in *Sheley v. Dugger*, 833 F.2d 1420 (11th Cir.1987), in discussing whether an inmate in the status of McQueen had a liberty interest in being returned to the general population of the prison, equated the Florida regulations with those in *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). This Court said:

> In *Hewitt*, the Supreme Court held that the due process clause of the Fourteenth Amendment did not create "an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segre-

gation quarters." *Id.* at 466, 103 S.Ct. at 869. The Court found, however, that Pennsylvania, in enacting guidelines for the use of administrative segregation, had created such a liberty interest: "[Pennsylvania] has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will', or 'must' be employed, ... and that administrative segregation will not occur absent specified substantive predicates— viz., 'the need for control,' or 'the threat of a serious disturbance,' ... [W]e are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that [Pennsylvania] has created a protected liberty interest." *Id.* at 471–72, 103 S.Ct. at 871.

The Florida Department of Corrections' rules are similar to those at issue in *Hewitt*. The administrative confinement rules, for example, provide that an inmate can be placed in administrative confinement only for certain reasons: if "disciplinary charges or criminal charges" are pending against the inmate and the "presence of the inmate in the general population would present a clear danger;" if an "investigation is pending and the presence of the inmate" would create a risk because of medical (including psychiatric) reasons; or if the "facts clearly indicate that the inmate must be removed from the general inmate population for the safety of any [persons] or for the security of the institution." Fla.Admin.Code Ann. § 33–3.0081(a)(a)–(d) (Supp.1985). The rules also state that: "administrative confinement *shall be* for the shortest period of time necessary," *id.* at § 33–3.0081(3) (emphasis added); the reason for placement "*shall be* explained to the inmate and he *shall be* given an opportunity to present his views," *id.* at § 33–3.0081(4)(a) (emphasis added); and a "formal evaluation report *shall be* required" if the inmate is kept in administrative confinement for more than thirty days, *id.* at § 33–3.0081(6)(a) (emphasis added). Likewise, the close

management rules provide that an "inmate placed in [CM] *shall be* given a hearing" before a review team, *id.* at § 33–3.0083(4)(a) (emphasis added); that the review team *"shall inform* the inmate of the basis for its decision," *id.* at § 33–3.0083(4)(b) (emphasis added); that a "formal evaluation report *is required* on inmates in [CM] each 30 days," *id.* at § 33–3.0083(6)(d); and that the "goal of the Close Management Review Team *shall be* toward returning the inmate to open population as soon as the facts of the case suggest it can be safely done," *id.* at § 33–3.0083(6)(e) (emphasis added).[1]

833 F.2d 1420 at 1424 (11th Cir.1987).

*(2) Liberty Interest*

■ As indicated above, the trial court found that "plaintiff has not pointed to any statute, regulation, rule, or practice that might be construed as giving him a protected liberty interest in *not* remaining on close management status and being released to open population" (citations omitted). *Sheley,* of course, holds to the contrary. Having determined that the rules and regulations issued by the State of Florida requiring repeated reviews and investi-

gations into the status of a prisoner held in close management satisfied the requirement announced by the Supreme Court in *Hewitt,* this Court stated: "We find that the mandatory language and substantive predicates in the Department of Corrections rules and regulations concerning administrative segregation and close management create for inmates a liberty interest in remaining in the general prison population...." *Id.* at 1424.

*Sheley* is not in conflict with either of the earlier unpublished opinions of this Court, *Butler v. Wainwright,* 734 F.2d 1480 (11th Cir.1984); and *Horton v. Tabah,* 837 F.2d 1092 (11th Cir.1988). In *Butler,* the inmate complained of the denial of due process when he was transferred from administrative confinement to close management. This Court held that the "regulations dealing with a transfer from administrative confinement to CM, ... are not of 'an unmistakably mandatory character' and therefore do not implicate a liberty interest." This is distinguishable from the language requiring frequent reviews and interviews during an inmate's extended status of close confinement.

---

1. In addition to the regulations quoted in *Sheley,* we find the following regulations deal with requirements for reviews during continuation of the status of close management:

(6) Review of Close Management.

(a) The Close Management Review Team *will review* inmates in close management every week for the first two months and at least every 30 days thereafter. If an inmate is confined for more than 30 days, the Superintendent *shall* review the decision of the Close Management Review Team at least once every 30 days.

(b) Necessary documentation *will* be placed in the inmate's file, either on the Daily Record of Confinement, Form DC.4–815, or in a brief memo indicating on what dates the reviews took place and the decision of the Team.

(c) Any inmate assigned to close management for more than 30 days *is to be* given a psychological assessment by the professional staff to determine his mental condition. The assessment *shall* include a personal interview. The psychologist *shall* prepare a report to the Superintendent with the facts of the case. The Superintendent will than make a final decision regarding continuation of confinement. All such assessments are to be documented. If the decision is to continue con-

finement and that confinement extends beyond 90 days, a new psychological assessment *will* be accomplished each 90–day period.

(d) A formal evaluation report *is required* on inmates in close management *each 30 days.* Such reports may be in brief paragraph form detailing the basis for confinement, what has transpired since the last report, the decision concerning continued confinement and the basis for that decision. Such report will be approved by the Superintendent or his assistant.

(e) The goal of the Close Management Review Team shall be toward returning the inmate to open population as soon as the facts of the case suggest it can be safely done.

(f) Inmates in close management *shall* receive a personal visit a minimum of:

\* \* \* \* \* \*

(4) As frequently as necessary, but not less than weekly, during the first two months and at least monthly thereafter by members of the *Classification* Team to ensure that the inmate's welfare is properly provided for, and to *determine the time and method of release* or any program changes.

Fla.Admin.Code Ann. (Supp.1985) (emphasis added.)

In *Horton,* the only issue was the sufficiency of the process accorded an inmate before he was transferred from the general prison population to close management. The Court found that the informal hearing granted Horton satisfied the requirements of *Hewitt v. Helms, supra.*

Thus, neither of these prior cases deals with the issue presented here: Did McQueen have a liberty interest in *not* remaining in close management? This question has now been answered affirmatively by this Court in *Sheley.*

### (3) *Other Issues*

Since the trial court dismissed the complaint because "plaintiff's claims do not arise to the level of constitutional violations," the trial court did not consider either of the defendant's other issues, which they raise here on the theory that this Court should affirm the judgment of the the trial court if that judgment was correct even though for a different reason than that assigned by the court itself. This theory which appellees base upon the Supreme Court decision of *Securities & Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), causes the appellees to contend that the Court should affirm the dismissal by the trial court on the ground that there is no showing that the defendants, not being members of the review team, had anything to do with causing whatever injury McQueen suffered, and on the second ground that the defendants were entitled to qualified immunity.

The problem with this position of the appellees is that the record is not clear as to either contention by the appellees. For instance, they contend that there is no allegation by McQueen that there was any causation by acts of the defendants as to the failure to provide the process that this Court has found was due once a liberty interest was established. They say that this Court should decide that there was no evidence of causation because the only allegation by McQueen that would tie the defendants into the denial of due process is his contention that Tabah and Dixon partic-ipated in asking the review committee to deny McQueen's request for return to the general population. This is not correct. In his petition which was filed *pro se* on a form supplied to be answered by the plaintiff appears the question: "Did you present the facts *relating to your complaint* in the state prisoner grievance procedure?" (Emphasis supplied.) To this, the plaintiff answered: "Yes." The next question is: "What steps did you take?" The answer there is: "I filed a DC 77." Then there is a requirement headed "A. Statement of Claim." To this, the plaintiff answered: "The plaintiff's Fourteenth Amendment right to due process of law have been violated by defendants." Then, in response to a heading: "Statement of Facts," the plaintiff says: "On 2/24/85 plaintiff filed a DC 77 requesting to be released back to open population." This grievance was granted on 3/18/85 (that is to say a hearing was held, but the requested release was denied). Then, attached to the statement is the form 77, which states as follows: "I am not demanding anything but I would like to be released back to population. I was tried on 2/22/85 and found not guilty on all charges. I'd like to be given the chance to work and receive gain time. I have been locked up for over 11 months without any writeups of any kind."

■ Considering this *pro se* complaint broadly, as we should, *see Jackson v. Reese,* 608 F.2d 159, 160 (5th Cir.1979), it alleges that McQueen has been kept in close confinement for 11 months without any review of his status as required by the regulations, which require several kinds of "writeups." *See* fn. 1, *supra.* Combined with his allegation that the defendants denied him his due process rights under the Fourteenth Amendment, this sufficiently alleges causation.

■ Defendants also contend that there was no allegation that these two defendants played any part in the failure to review McQueen's status, since they were not members of the review team. They overlook Reg. 33–3.0083(6)f)(4) which states that an inmate in CM shall receive a visit not less than weekly during the first two

months and at least monthly thereafter by members of the *classification* team *"to determine the time* and method *of release."* Defendants' motion for summary judgment is not supported by an affidavit that deals with the actions of Tabah and Dixon as members of the classification team in carrying out their duties under Reg. (6)(f)(4). It is not clear from the record that they played no part in the alleged deprivation of due process alleged by the plaintiff.

■ Finally, the appellees' contention that they are entitled to a qualified immunity from suit cannot be decided in their favor by this Court on appeal. They have abandoned their claim to absolute immunity. The standard to be applied to a claim for qualified immunity is whether the public officer's conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The trial court here could certainly have concluded that these defendants would reasonably have known that these regulations gave McQueen a liberty interest and that they were required to perform the duties prescribed by Reg. (6)(f)(4) to comport with due process under the Constitution. The Florida District Court of Appeal for the Fourth District had held as much in *Arrington v. Wainwright,* 452 So.2d 1120 (1984). In that case, the Florida court mandated a review of a prisoner's close management status under Reg. 33–30083(2)(a) Fla.Admin.Code *and the due process clause of the Fourteenth Amendment. See also, Sims v. Adams,* 537 F.2d 829, 832 (5th Cir.1976).

The state of the record therefore does not permit us to conclude that the trial court's summary judgment was correct on the other grounds asserted by the appellees.

The judgment is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.