678 F.2d 787
 Richard G. PEPPERLING, Lee Pendergrass, and Gary Quigg,
Plaintiffs-Appellants,
v.
Roger W. CRIST, Warden of Montana State Prison; James
Blodgett, Deputy Warden; Gary Weer, Associate
Warden; et al., Defendants-Appellees.
 No. 81-3086.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1981.
Decided June 2, 1982.
 
 Gary Quigg, pro se.
 Nick A. Rotering, Dept. of Institutions, Helena, Mont., for defendants-appellees.
 Appeal from the United States District Court for the District of Montana.
 Before GOODWIN and FLETCHER, Circuit Judges, and PANNER,* District Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 Appellants are prisoners confined in the Montana State Prison. Their appeal challenges the constitutionality of conditions inside that institution. They object specifically to the use of mass punishments, confiscation of inmate property, and mail censorship. We note jurisdiction under 28 U.S.C. § 1291, and affirm in part, reverse in part, and remand.
 
 1. MASS PUNISHMENTS
 
 2
 Careful review of the record reveals that the only evidence of mass punishments presented at trial described an incident which took place in April of 1980. A guard was hit and injured by a homemade dart. Prison officials immediately instituted a general lock-up in the cell block and began an investigation to determine who had committed the offense. The lock-up remained in effect for approximately 48 hours. Appellants contend that this action constituted a deprivation of constitutional rights. Essentially the claim is that such actions violate fundamental prohibitions against punishing the innocent. However, nothing in the actions of the prison officials indicates that the lock-up was intended to be disciplinary. The prisoners were not told, for example, that everyone would be confined until the guilty party confessed. There had been a major infraction of prison rules. Presumably, a prisoner was armed with some sort of weapon. The lock-up was instituted in order to maintain security within the cell block.
 
 
 3
 The courts accord the decisions of prison officials extreme deference, see Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977), especially in matters of internal security, see Phillips v. Bureau of Prisoners, 591 F.2d 966, 972 (D.C.Cir.1979).
 
 
 4
 The deprivations associated with an institutional lock-up, including twenty-four hour confinement, and curtailment of all association, exercise and normal vocational and educational activity, may constitute a due process violation, as well as a violation of the Eighth Amendment, if they persist too long. Necessarily, the determination of when emergency action, by its severity or prolongation, reaches a point requiring due process protection must be based on a careful analysis of the unique factual situations presented by each case. On the facts of the present case, we find no constitutional violation.
 
 2. CONFISCATION OF INMATE PROPERTY
 
 5
 Appellants allege that prison guards conduct random searches of the cell block, and that during the course of these searches, prisoners' property is often damaged or stolen. Appellants are not complaining of the searches themselves, but that the manner in which they are conducted results in deprivations of property without due process.
 
 
 6
 The district court found that the allegations as to the takings were not proved. It determined that in most of the cases complained of, prisoners were in possession of contraband, items they knew were subject to confiscation. In others, there was some question as to whether the prison guards were, in fact, responsible. On the basis of the record before us, we cannot conclude that these findings by the district court were clearly erroneous; we therefore affirm its judgment as to this issue.
 
 3. CENSORSHIP OF INMATE MAIL
 
 7
 The framework for analyzing First Amendment claims of prisoners was first identified in Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), where the Court stated:
 
 
 8
 (A) prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to prohibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.
 
 
 9
 The legitimate penal objectives identified in Pell were deterrence of crime by the rehabilitation process and by the confinement of criminal offenders in a facility isolated from the rest of society, and the maintenance of internal security within the institution. Id. at 822-23, 94 S.Ct. at 2804.
 
 
 10
 Censorship of prisoners' mail, therefore, may be justified where the regulation or practice in question furthers one of these important or substantial governmental interests and is unrelated to the suppression of expression. But the limitation must be no greater than necessary to protect the governmental interest involved. Procunier v. Martinez, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).
 
 
 11
 Included in appellants' claims are issues involving the handling of prisoner mail, the prohibition on prisoners' receipt of nude pictures of wives and girlfriends, and the prohibition on receipt of certain publications, specifically Hustler and High Times.
 
 
 12
 Appellants contend that since prison officials do not eavesdrop on prisoner conversations with visitors, there is no rational reason for them to censor prisoner mail at all. Presumably, the kind of information which is considered a threat to prison security when contained in a letter poses the same threat when communicated orally. Admittedly, the logic of appellants' argument is attractive. However, censorship of prisoners' mail is, in some circumstances at least, entirely consistent with the rule that First Amendment rights must be protected by the least restrictive rule. Procunier, 416 U.S. at 413-14, 94 S.Ct. at 1811-12.
 
 
 13
 In the footnotes to Procunier, for example, the Supreme Court explicitly approved one set of guidelines on censorship and deliverability of prisoner mail. Id. at 416 n. 15, 94 S.Ct. at 1813. These guidelines differ from those in the instant case in one significant respect. The approved guidelines prohibit communications which are "obscene." Obscenity is not protected speech. The Montana State Prison guidelines prohibit the "sexually explicit." The Supreme Court's obscenity decisions do not draw a bright line between non-obscene and obscene material; however, it is clear from those decisions that what may be sexually explicit is not necessarily obscene. Absent some additional justification, therefore, for prohibiting prisoners from receiving sexually explicit material, the Montana State Prison guidelines do infringe the First Amendment freedoms of its prisoners. This additional justification must be grounded in one of the legitimate governmental interests set forth in Pell, either prison security or rehabilitation. No such claim can be made here.
 
 
 14
 The prison officials argue that they do not enforce the regulation strictly. This merely demonstrates the capriciousness of the rule. They permit prisoners and their wives to exchange sexually explicit letters, but not photographs. They carry Playboy magazine in the prison library. Yet they prohibit any prisoner from receiving Hustler magazine. It may be true that Hustler is more "explicit" than Playboy in some respects, but there is no justification for censorship on that basis alone.[1] Prison officials have no legitimate governmental interest in imposing their own standards of sexual morality on the inmates.
 
 
 15
 With respect to the prohibition against nude photographs of wives and girlfriends, the prison officials do contend that these items are highly emotionally charged and often lead to violent altercations among prisoners. The point is well-taken. See, e.g., Trapnell v. Riggsby, 622 F.2d 290 (7th Cir. 1980). However, the rule is too broad. It is not the mere receipt of such photographs by a particular prisoner which provokes violence but rather the interest aroused in other inmates by the photographs. A less restrictive alternative would be to prohibit the prisoners from tacking these photographs up in their cells or otherwise displaying them to the "public."
 
 
 16
 Prison officials also prohibit receipt of any copies of the magazine High Times. High Times is a publication allegedly devoted to information on narcotic and hallucinogenic drugs. Prison officials claim that this is not appropriate reading material for prisoners, many of whom were convicted of drug-related crimes. The district court upheld the prohibition against High Times on that basis but made no finding as to the content of the magazine to justify its holding. Nor is there any copy of the magazine in the record. The district court cannot, without close examination of the magazine, determine whether the prohibition as here applied meets the test in Pell. See Morgan v. La Vallee, 526 F.2d 221, 224 (2nd Cir. 1975). Accordingly, we remand this issue for additional findings.
 
 
 17
 We do not challenge the authority of prison officials to censor specific portions of any magazines, including Hustler and High Times, sent to a prisoner, provided that censorship is based upon a determination that the prisoner's receipt of the publication will have an adverse impact on either the prisoner's rehabilitation or prison security. We note, however, that the blanket prohibition against receipt of the publications by any prisoner carries a heavy presumption of unconstitutionality. The burden of justifying the restriction of First Amendment rights rests on the prison officials who seek to impose the restriction. See Aikens v. Jenkins, 534 F.2d 751, 755 (7th Cir. 1976).
 
 
 
 *
 The Honorable Owen M. Panner, District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The district court apparently relied on the alleged "sexually explicit" content of Hustler to justify its censorship. However, no copy of the magazine can be found in the record upon which it could have based such a determination