FRANK D. LOVELL vs. SUPERINTENDENT, NORTH CENTRAL
CORRECTIONAL INSTITUTION, & another.[1]

No. 87-700.

Worcester. February 16, 1988. — May 11, 1988.

Present: BROWN, KAPLAN, & DREBEN, JJ.

*Imprisonment*, Enforcement of Discipline.

Discussion of the standard of judicial review, as enunciated in *Turner* v.
    *Safley*, 482 U.S. 78 (1987), applicable to claims by prisoners that prison
    regulations violate their State and Federal constitutional rights. [36-38]
In an action seeking declaratory and injunctive relief brought by a State
    prison inmate claiming that a directive by a correctional official requiring
    "all nude photos" to be removed from view in prison housing units and
    common areas violated his State and Federal constitutional rights, the
    judge was not warranted in upholding the directive where, on the record
    presented, no logical connection was shown between the acknowledged
    restriction on the prisoner's First Amendment rights and the claimed
    legitimate penological objective of maintaining security in the facility
    [38-40]; furthermore, where there appeared to be an alternative means
    of accommodating the prisoner's rights at minimal cost to valid penologi-
    cal interests, the directive was not shown to be reasonable as matter of
    law [40]. BROWN, J., concurring.

CIVIL ACTION commenced in the Superior Court Department
on February 18, 1986.

The case was heard by *Robert V. Mulkern*, J., on motions
for summary judgment.

*Michael Cohen* for the defendants.

*Frank D. Lovell*, pro se, submitted a brief.

DREBEN, J. A memorandum entitled "Re: Smut Pictures,"
dated October 15, 1985, was sent by the deputy superintendent,
North Central Correctional Institution, Gardner, to unit mana-

---

[1] Commissioner of Correction.

gers. It required that "all nude photos [be] removed from view in any and all Housing Units and common areas of the facility." On October 17, 1985, the plaintiff filed an inmate grievance complaining of the removal of Playboy magazine pictures from the bulletin board of his cell. The grievance was denied, first by the superintendent of the institution,[2] and then on appeal by the grievance coordinator of the Department of Correction. The latter cited *Pepperling* v. *Crist*, 678 F.2d 787 (9th Cir. 1982), as the basis for his decision. Subsequently, a copy of another picture, "Bather" by Renoir, was alleged by the plaintiff to have been removed from his cell.

The plaintiff filed a complaint seeking declaratory and injunctive relief, claiming that the restrictions violated his State and Federal constitutional rights. Both the plaintiff and the defendants moved for summary judgment. A judge of the Superior Court denied the plaintiff's motion and allowed the defendants' on the basis of *Pepperling* v. *Crist, supra* at 790-791. The reliance on that case is misplaced. We reverse and remand for further proceedings to determine whether the directive[3] of October 15, 1985, is "reasonably related to legitimate penological interests," the standard recently enunciated in *Turner* v. *Safley*, 482 U.S. 78, 89 (1987).[4]

This standard of review for constitutional claims of prisoners reflects two important concerns. *Id.* at 84-85. The first is the

---

[2] The superintendent's denial under the heading "Reasons" stated, "I am not prohibiting possession of pictures only that they cannot be on open display per room regulations."

[3] In response to questioning from the bench at oral argument, the defendants supplied us with orientation handbooks and other departmental materials. We can only take judicial notice of those materials which are published in the Code of Massachusetts Regulations. The propriety of the procedure in promulgating the memo, as contrasted with its substance, has not been argued, and we do not consider whether the promulgation procedure was proper.

[4] In *Turner*, the court established the standard of review when only the rights of prisoners are involved, a question left open in *Procunier* v. *Martinez*, 416 U.S. 396, 408, 409 (1974). In *Procunier* a standard of heightened scrutiny was applied, *id.* at 413-414, on the basis that the liberties of free citizens were implicated. *Id.* at 409.

need to protect the constitutional rights of prison inmates. The second is that courts are ill equipped to deal with the problems of prison administration and, therefore, must exercise a policy of " 'judicial restraint regarding prisoner complaints.' " *Id.* at 85. See also *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 348-349 (1987).

It is settled "that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier*, 417 U.S. 817, 822 (1974). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, at 84. The memorandum here unquestionably burdens the prisoner's First Amendment rights, and the defendants concede the point. They make no argument that the material is obscene or otherwise not within the ambit of First Amendment protection. They do argue, however, that the rule meets the *Turner* test, i.e., that it is "reasonably related to legitimate penological objectives" and is not " 'an exaggerated response' " to those concerns. *Turner*, at 89, 90.

In *Pell* v. *Procunier*, *supra* at 822-823, the court listed the legitimate penological objectives in light of which a court "must assess challenges to prison regulations based on asserted constitutional rights of prisoners." These are deterrence of crime, rehabilitation, and internal security within the correctional facility.

The only suggestion in the record before us of the penological objectives of the writer of the memorandum is that contained in the defendant's own grievance appeal form, which states: "The reason for this restriction is due to women being employed at NCCI as well as persons with religious beliefs."[5] There was no testimony or other evidence supporting the existence of these employee sensibilities or indicating their importance to prison administration, or even that the prison officials concur-

---

[5] The prisoner commented on that reason as follows: "I further submit the following argument. Men are forced to shower and defacate [*sic*] in view of women employees yet these employees are offended by the display of the tasteful female body."

red that these were the concerns which prompted the directive. The defendants' brief, citing as record support only the inmate's grievance form, argues that a "privacy right of a 'captive audience' such as employees not to be exposed to material they may find offensive . . . [is] served by the . . . limited restriction on posting nude pictures on the bulletin board in the prisoner's cell." In addition, the defendants urge, citing *Pepperling* v. *Crist*, 678 F.2d 787 (9th Cir. 1982), that the restriction is reasonably related to security concerns.

In *Turner*, four factors, set forth in the margin, were considered to be relevant in determining the reasonableness of a regulation.[6] Applying those factors to this bare record, the conclusion is not warranted that the prohibition is reasonable as matter of law.

We deal first with the security issue. As noted earlier, the defendants' sole basis for claiming such concerns is a citation to

---

[6] "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. [Citation omitted.] Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression. [Citations omitted.]

"A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to prison inmates. . . .

"A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. . . .

"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. [Citation omitted.] By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. This is not a 'least restrictive alternative' test. . . . But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, at 89-91.

*Pepperling* v. *Crist*, *supra*. In that case, prison authorities prohibited prisoners' receipt of nude pictures of wives and girlfriends and of "sexually explicit" material. Relying on the regulations, prison officials banned as "sexually explicit" the receipt of the magazine Hustler. The court held that neither prison security nor rehabilitation, the penological objectives discussed in *Pell*, could justify the prohibition against "sexually explicit" material without a determination that a prisoner's receipt of the publications would have an adverse impact on either the prisoner's rehabilitation or prison security. *Pepperling* v. *Crist*, *supra* at 790-791. See *Thibodeaux* v. *South Dakota*, 553 F.2d 558, 559 (8th Cir. 1977), where censorship of a publication was not allowed without findings that the material (publication entitled "Mature") would have a detrimental effect upon rehabilitation, and also see *Aikens* v. *Jenkins*, 534 F.2d 751, 756, 758 (7th Cir. 1976), striking as overbroad a regulation which allowed nude photographs only if they were "supportive or incidental to a theme not designed primarily to arouse sexual drives." Cf. *Abbott* v. *Meese*, 824 F.2d 1166, 1173 (D.C. Cir. 1987), cert. granted, 485 U.S. 1020 (1988) (nexus required between penological objective and banning of sexually explicit material, but applying heightened standard of review, see note 4, *supra*). In reaching the conclusion that there is no justification for censorship on the sole basis that photographs are sexually explicit, the *Pepperling* court stated, at 790, "Prison officials have no legitimate governmental interest in imposing their own standards of sexual morality on the inmates."

Restrictions on nude photos of wives and girlfriends were, however, permitted based on a contention of prison officials that these items are "highly emotionally charged and often lead to violent altercations among prisoners." *Id.* at 790.[7] The *Pepperling* court cited *Trapnell* v. *Riggsby*, 622 F.2d 290 (7th Cir. 1980), which upheld against constitutional challenge a

---

[7] The court held that the rule which banned receipt of such materials was too broad and suggested the less restrictive alternative of prohibiting the prisoners from displaying their photographs. *Id.* at 790-791.

regulation banning photos of girlfriends and wives but not of nude photographs published for commercial use and so marked. Evidence was presented in *Trapnell* which showed that the propensity for violence in the institution, where inmates with assaultive backgrounds were housed, was increased by nude photos of girlfriends and wives. *Id.* at 292-293.

Here, unlike *Pepperling* and *Trapnell,* where there was a basis for connecting the nude photos of wives and girlfriends with security, there is nothing in the record to which prison officials can point suggesting any security problem posed by the pictures from Playboy magazine or the Renoir pictures. We recognize that posting of photographs differs from their receipt and possession, see *Pepperling* at 790-791; nevertheless, in the absence of a logical connection between the governmental objective claimed (security) and the restriction on First Amendment rights, some evidence of their reasonable relationship should be presented before the limitation can be upheld as matter of law.

As to the claim of employee sensibilities, no precedent has been cited suggesting that this is a legitimate governmental interest. Even assuming that this concern could by evidence be shown to affect prison administration, there seems to be an obvious solution, namely, to require that such pictures be placed on the wall which faces inwards towards the cell. This "alternative . . . [appears] fully [to] accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests." *Turner,* 482 U.S. at 91, see note 6, *supra.* In any event, the concerns of the institution, as appearing only in the inmate's grievance form, do not without more, warrant a decision that the limitation on First Amendment rights is reasonable as matter of law and not an exaggerated response. Summary judgment for the defendants should not have been entered.

The judgment is reversed and the matter remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

BROWN, J. (concurring). I fully agree with the well-reasoned opinion of the majority. As this case is to be remanded to the Superior Court, I do not intend to intimate a view of the merits or the ultimate result.

I would, however, like to point out once again to attorneys, particularly those who represent the government, that their responsibilities involve counseling as well as litigating. All too often such cases as these reach this court from the office of the Attorney General. To "confess error" does not have to be an abdication of professional responsibility; it is often the sensible course to take in clear cases in order not to present unnecessarily routine internal administrative disputes or house-keeping matters to a panel of the Appeals Court or to any other court. It is a complete waste of judicial time, as well as an unnecessary dissipation of the limited resources of the Attorney General. I think it is a professional imperative for a government lawyer (as well as his duty as an officer of the court) to advise his client prior to litigation — whether an agency, an adminis-trator, or a policymaking official[1] — that a regulation, directive, or other administrative scheme is legally indefensible, and the result in court foredoomed. On occasion, a skilled government attorney, if sufficiently knowledgeable, may wish to suggest that such action of the official is unwise or ill-advised. In sum, a good democratic government must be protected from within, as well as watched from without.

---

[1] Without joining in the debate, I merely note that there are some who view the public as the principal client of an attorney representing the gov-ernment.