**Ford POWELL, et al., Plaintiffs,**

**v.**

**Chase RIVELAND, et al., Defendants.**

**No. C96–5375FDB.**

United States District Court,
W.D. Washington.

Oct. 7, 1997.

Pompeyo B. Guloy, Monroe, WA, pro se.

Ford Powell, Monroe, WA, pro se.

Mary E. Fairhurst, Colleen B. Evans, Olympia, WA, for defendants.

## ORDER

BURGESS, District Judge.

The Court, having reviewed Plaintiff's complaint, amended complaint, Defendants' motion for summary judgment, Plaintiff's opposition thereto, Defendants' reply, Plaintiff's motion for appointment of counsel, Defendants' response thereto, the Report and Recommendation of the Honorable David E. Wilson, United States Magistrate Judge, and the remaining record, does hereby find and ORDER:

1. The Court adopts the Report and Recommendation;

2. Defendants' motion for summary judgment is GRANTED;

3. Plaintiff's motion for appointment of counsel is DENIED;

4. This action is dismissed with prejudice; and

5. The Clerk is directed to send a copy of this Order to Plaintiff, counsel for Defendants, and to Judge Wilson.

## REPORT AND RECOMMENDATION

WILSON, United States Magistrate Judge.

### I. INTRODUCTION

On April 19, 1996, Plaintiffs Ford Powell and Pompeyo Guloy filed their civil rights complaint under 42 U.S.C. § 1983, naming the following three persons as Defendants: (1) Washington Department of Corrections' ("DOC") Secretary Chase Riveland; (2) Division of Prisons' Correctional Program Manager Maggie Miller–Stout; and (3) Division of Prisons' Administrative Assistant Margo Jensen. (Doc. # 10). On January 25, 1997, Plaintiff Ford Powell, but not Plaintiff Guloy,[1] filed an amended complaint, naming five Defendants: (1) Chase Riveland; (2) Tom Rolfs, Director of Prisons; (3) Mike Williams, Associate Superintendent of Custody for the Washington State Reformatory ("WSR"); (4) Geraldine Newman, Correctional officer at WSR; and (5) Lori Bowling, Correctional Officer at WSR. Plaintiff dismissed previous Defendants Miller–Stout and Jensen. (Doc. # 30). The amended complaint challenges DOC and WSR policy regarding restrictions on incoming mail that is sexually explicit, but not obscene, and sues Defendants in their official and personal capacities. Plaintiff alleges violations of the First Amendment and of the Fourteenth Amendment Due Process Clause from WSR's confiscation of certain editions of the magazines *Swank* and *Fox* (Doc. # 30:6–7).

On July 7, 1997, Defendants filed a motion for summary judgment. (Docs.# 48–49). On July 31, 1997, Plaintiff filed a memorandum in opposition to summary judgment and a motion for the appointment of counsel. (Docs.# 52–55). On August 12, 1997, Defendants filed a reply in support of their motion for summary judgment and a response to Plaintiff's motion for the appointment of counsel. (Docs.# 56–57).

The Court, having reviewed the respective motions, all papers in support and in opposition, and the remaining record in its entirety, recommends that Defendant's motion for summary judgment be GRANTED, Plaintiff's motion for appointment of counsel DENIED, and this case dismissed with prejudice.

### II. BACKGROUND

Plaintiff challenges DOC policy 450.100, entitled "Offender Use of Mail," and WSR field instruction 450.100.01, both of which restrict a prisoner's ability to receive sexually explicit incoming mail. (*See* Docs. # 30; # 49, Exs. # 1–2). The field instruction went into effect on March 25, 1992. (Doc. # 49, Ex. # 2 at 3–4). Defendant Riveland signed a version of the DOC policy which went into effect on February 1, 1994; the policy was originally enacted in late 1992 by former Department of Prisons Director Jim Spalding. (*Id.*, Exs. # 1, # 4). The field instruction parallels the language of the DOC policy. The DOC policy defines sexually explicit material as written or graphic material that depicts one of the following:

1. Where one of the participants in the act is, or appears to be, non-consenting;

2. Where one of the participants appears to be forceful, threatening, or violent;

3. Where one of the partners is dominating one of the other participants and one of the individuals is obviously in a submissive role or one of the participants is degraded, humiliated, or willingly en-

---

1. Plaintiff Guloy has not responded to the orders of the Court and has refused to prosecute this action. Accordingly, considering the Court's and the public's need to expeditiously resolve this matter and Plaintiff Guloy's refusal to follow the orders of this Court, Plaintiff Guloy and the claims he made in the original complaint should be officially dismissed from this action without prejudice.

gages in behavior that is degrading or humiliating;

4. One of the participants is a child, or appears to be a child;

5. Where there is actual penetration, be it penile/vaginal-oral, penile-anal, or penile-vaginal; digital-anal, digital-vaginal; or insertion of any inanimate object in the vaginal or anal cavity, and the depiction in the context presented is deemed to be a threat to legitimate penological objectives[;]

6. Where any bodily excretory function is depicted;

7. Material depicting bestiality, sadomasochistic behavior, or bondage; or

8. The material is reasonably deemed to be a threat to legitimate penological objectives.

(*Id.,* Ex. # 1 at 2).

When mail comes into a prison facility, such as WSR, the mailroom staff initially screens the mail to determine whether the mail may violate DOC policy 450.100. (Doc. # 57, Ex. # 37 at 1). Apparently, a designated superintendent at the facility then reviews the material that is suspected to be "sexually explicit" and determines whether the material should be sent to Defendant Rolfs for his review. (*Id.* at 1–2). Defendant Rolfs ultimately determines whether the material violates DOC policy. If Defendant Rolfs determines that the material is sexually explicit and poses a threat to legitimate penological objectives, he submits an electronic mail message to all institutions indicating that they should restrict inmates from receiving the material. (*Id.* at 2; Doc. # 49, Exs. # 20 at 5, # 21–36).

DOC policy 450.100 allows an inmate to challenge the rejection of his incoming material. If a prisoner's mail is restricted, the inmate first receives notice of the restriction and the reasons why the mail was restricted. The inmate then has the right to ask for further review of the restriction. (*See* Doc. # 49, Ex. # 1 at 5; WAC 137–48–050(1)–(3)).

In Plaintiff's case, the mailroom staff at WSR rejected certain editions of the magazines *Swank* and *Fox* after first receiving notice that the editions violated the DOC policy. Defendant Newman rejected the following editions of *Swank* and *Fox* magazine: the January 1996, February 1996, March 1996, April 1996, May 1996, June 1996, and July 1996 issues of *Swank* and the January 1996 and February 1996 issues of *Fox.* (*Id.,* Ex. # 6). Defendant Bowling rejected the following editions of *Swank* and *Fox:* the August 1996, September 1996, and October 1996 issues of *Swank* and the August 1996, October 1996, November 1996, and 1996 Anniversary issues of *Fox.* (*Id.,* Ex. # 7). Defendants Newman and Bowling prepared rejection notices for each of the magazines, explaining to Plaintiff that the issues were rejected as containing sexually explicit material. (*Id.,* Ex. # 19).

The essential and material facts surrounding the adoption of the DOC policy and WSR field instruction, which are not contested by Plaintiff, were summarized by Defendants as follows:

The research and drafting of DOC 450.100 began in 1990 after an inmate filed a lawsuit challenging the confiscation of sexually explicit materials and books. [*Id.,* Ex. # 4]. One purpose of the policy was to define and set parameters with objective criteria with respect to obscene and sexually explicit materials. [*Id.,* Exs. # 4, 20]. Prior to drafting the policy, DOC retained two experts in the field of psychology, Dr. Victor B. Cline and Dr. Bill Marshall, who provided professional advice on the effects of pornography on the viewer. [*Id.,* Exs. # 4, 8A–9]. Also prior to drafting the policy, the DOC obtained legal advice from the Attorney General's Office. [*Id.,* Ex. # 4].

. . . .

Defendant Rolfs, current DOP Director, as well as others, are familiar with the effects on inmates of exposure to sexually explicit materials. [*See Id.,* Exs. # 5, # 10–17, # 20]. DOC 450 .100 applies to all inmates incarcerated in all Washington DOP corrections facilities. [*See* Ex. # 1]. WSR 450.100.01 applies to all inmates incarcerated at WSR. [*See* Ex. # 2].

. . . .

Because a prison population is highly controlled and inmates no longer have the regular opportunity to engage in consenting heterosexual sex, acting out behaviors

**1252**

pose a grave danger to the safety of other inmates and to staff. [*Id.,* Exs. # 5; Ex. # 20]. Unfortunately, even today, inmates are victimized by sexual assaults from other inmates. Inmates at WSR have been caught engaging in consensual and nonconsensual homosexual sex. [*Id.,* Ex. # 5]. Inmates have also been forced into performing fellatio on other inmates. Female staff are a favorite target for inmates either exposing themselves or masturbating in front of staff. [*Id.*].

. . . .

Inmates viewing of sexually explicit material causes two problems for prison administrators. First and foremost is the threat to the security of the institution and the safety of all inmates and staff. Second, the viewing of sexually explicit material undermines rehabilitation of offenders. [*Id.,* Ex. # 20].

[As to the first concern, aggressive] and predatory behavior endangers the lives and safety of other inmates and staff. Examples of this type of behavior include non-consensual sex, whether homosexual or heterosexual; oral sex; sexual molestation of other inmates or staff; masturbation or exposing in front of staff; and inappropriate touching or writing to staff. [*Id.*].

Sexually explicit material portrays women in dehumanizing, demeaning and submissive roles which, within the walls of a prison, lead to disrespect for female correctional officers and other staff. Lack of respect and control in dealing with inmates can endanger the lives and safety of staffs and inmates. [*Id.*].

[As to the second concern, once] sexually explicit material enters an institution, it is impossible to control who may view it. Many offenders incarcerated at WSR are sex offenders. Viewing these materials serves to rekindle the offender's desire to control and manipulate another person, thereby undermining and interrupting rehabilitation efforts. [*Id.*]. Additional security concerns arise when inmates try to sell, barter or forcefully take these materials. [*Id.,* Exs. # 8, # 18].

. . . .

There is a four-factor syndrome common to men who view pornographic materials. [*Id.,* Ex. # 8]. The first factor is addiction. Pornographic materials provide a very powerful, sexual stimulant which leads to sexual relief through masturbation. Once involved, men keep coming back for more and still more. [*Id.*]. The second phase is escalation. Over time, the viewers require more explicit, rougher and more deviant kinds of sexual material to achieve their "sexual high." There becomes an increasing need for a greater stimulant in order to achieve the same effect, much like a drug addiction. The addiction is to the fantasy. *Id.*

The third factor is desensitization. Books and magazines once perceived as shocking, illegal, repulsive or immoral, though still sexually arousing, in time come to be seen as acceptable. Affected men can watch films of rape, child molestation, and other sexually deviant behavior and become desensitized. No matter how gross or deviant the behavior, in time it becomes legitimized. There is an increasing sense that everybody must engage in such activity. *Id.*

The fourth phase is an increasing tendency to act out sexually the behaviors viewed in the pornography to which the viewer is exposed, including compulsive promiscuity, exhibitionism, group sex, voyeurism, rape, and inflicting pain on themselves or their partner during sex. The behaviors become locked in as part of the sexual addiction. No matter how hard they try, attempts at self-discipline or self-control do not work. *Id.*

Masturbatory conditioning is the lowest level of acting out. Masturbating to the fantasy of this exposure can sometimes later lead to participation in deviant sexual acts. *Id.* The probability or possibility of inmates engaging in consensual and nonconsensual sex with other inmates increases exacerbating the problems with HIV, hepatitis, herpes, and other sexually transmitted diseases increases. *Id.*

The presence of sexually explicit material in a prison aggravates sexual tension in a way that is unhealthy and unfair to those inmates against whom the sexual attention or aggression may be turned. *Id.* Inmates

who are not homosexual, may engage in homosexual acts in order to satisfy their sexual appetite created by the presence of sexually explicit materials. *Id.*

Men immersed in sexually explicit material in prison will have been exposed to a very biased, distorted source of information on human sexuality, much of which is scientifically inaccurate, untrue, and unhealthy. An individual in prison does not have access to normal relationships, making him more vulnerable to inappropriate modeling which pornography presents. *Id.*

. . . .

Masturbating while viewing pornography creates an unhealthy physical and psychological illness, placing an inmate at a greater risk for acting out if he were to be released. *Id.* Masturbation without pornography can be a more healthy sexual release. *Id.*

Allowing sexually explicit materials into a penal institution is conditioning an inmate into deviancy. *Id.* DOC's policies attempt to keep sexually explicit materials out of the institution, helping to prevent the feeding of the illness. *Id.* DOC's policy is a necessary and reasonable way to control viewing and dissemination of sexually explicit materials within the prison. *Id.*

(Doc. # 49 at 2–9).

## III. ANALYSIS

### A. Defendants' Motion for Summary Judgment

Plaintiff poses three constitutional challenges to the DOC policy and WSR field regulation: (1) a facial challenge to the constitutionality of the policy/regulation under the First Amendment; (2) as an applied challenge under the First Amendment; and (3) a due process challenge to the confiscation of his *Swank* and *Fox* magazines. Defendants have moved for summary judgment on all claims.

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.1975), *cert. den'd,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Summary

judgment is appropriate if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Swayze v. United States,* 785 F.2d 715, 717 (9th Cir.1986) (citing Fed.R.Civ.P. 56(c)). The standard provided by Rule 56 requires not only that there be *some* alleged factual disputes between the parties, but also that there be *genuine* issues of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine disputes are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Material facts are those which might affect the outcome of the suit under governing law. *Id.* The record reflects that there is no genuine factual dispute and that Defendants are entitled to judgment as a matter of law.

1. The constitutionality of DOC policy 450.100 and WSR field regulation 50.100.01 under the First Amendment

The United States Supreme Court in *Thornburgh v. Abbott,* 490 U.S. 401, 404, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), held that the reasonable and rational relationship test of *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), applies in assessing the constitutionality of content based prison regulations that restrict incoming mail. Although prisoners retain their constitutional rights while imprisoned, those rights must be analyzed in light of the prison's need to maintain and advance its legitimate interests. What one person may be permitted to do or read in the privacy of one's home or a public library may be inappropriate in an institutional environment, such as a school or, in this case, a prison. Prisoners are not only captive in a literal sense, they are also captive in the constitutional sense—what one prisoner may enjoy reading in his cell may certainly offend (or endanger) a cellie, another prisoner, or a guard. "Once in the prison, material . . . may be expected to circulate among prisoners, with the concomitant potential for coordinate disruptive conduct." *Thornburgh,* 490 U.S. at 412. With good reason, therefore, the Supreme Court only requires courts to ask whether a prison regulation that restricts

incoming mail is "reasonably related to legitimate penological interests." *See Thornburgh*, 490 U.S. at 404 (citing *Turner*).

In *Thornburgh*, the Supreme Court addressed whether a federal regulation that permitted a warden of a federal prison to restrict "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity" was reasonably related to legitimate penological interests. *Thornburgh*, 490 U.S. at 404–405 (addressing C.F.R. § 540.71(b) (1988)). The Court noted first that the objective of the regulation was neutral and objective—maintaining prison security—and that the regulation—which gave "prison authorities broad discretion" was rationally related to achieving the objective. *Id.* at 416–17. The Court noted second that alternate means of exercising First Amendment rights still existed because the regulation permitted a broad range of materials to be sent into prison. *Id.* at 417. The Court next noted that the regulation protected the interest of other inmates and guards because accommodation of sexually explicit materials could restrict the liberty and safety and everyone else in the prison. *Id.* at 418. Finally, the Court stated that no other, easy alternatives existed and that the regulation was not an " 'exaggerated response' to the problem at hand." *Id.* As a result, the Court upheld the validity of the regulation.

■ The Court finds that DOC policy 450.100 and field regulation 450.100.01 parallel the federal regulation upheld in *Thornburgh* and are therefore facially valid under the holding in *Thornburgh*. First, the objectives of the policy/regulation—to preserve institutional security and to facilitate inmate rehabilitation—are neutral objectives and the restriction is rationally related to achieving those goals. *See also Pepperling v. Crist*, 678 F.2d 787, 790 (9th Cir.1982) (noting that restrictions on sexually explicit speech "must be grounded in one of the legitimate governmental interests . . . either prison security or rehabilitation"). Prior to implementing the

policy, research was done on the effects of sexually explicit material and the policy/regulation was written to target those harmful materials. The provisions of the policy/regulation only restrict materials which may encourage harmful acting out behaviors, including materials that depict penetration and bodily excretion, behaviors that would be detrimental to legitimate penological interests if they occurred in prison.[2] "Where . . . prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' . . . . [A] regulation which gives prison authorities broad discretion [in achieving a neutral objective] is appropriate." *Id.* 490 U.S. at 415–16.

In addition, for the same reasons identified in *Thornburgh*, the policy/regulation also satisfies the second, third, and fourth *Turner* factors. Under the second factor, prisoners still have access to incoming mail and to even "nude" mail. Under the third factor, introduction of sexually explicit materials into the prison environment may be harmful to other prisoners and to prison staff. Under the fourth factor, although Defendant Riveland has chosen to ban any publication that contains "sexually explicit" material and to not simply require mailroom staff to remove select pages from the publication, Defendants have demonstrated that they rejected this less restrictive alternative based on reasonable founded fears and administrative concerns. *See Id.* 490 U.S. at 419. Accordingly, the Court finds on the record before it that the policy/regulation satisfies the requirements of the First Amendment as applied in the prison environment.

2. The constitutionality of DOC policy and the WSR field regulation as applied to the editions of *Swank* and *Fox*

■ Plaintiff argues that even if the policy and regulation are facially valid, Defendants inappropriately applied the regulations when they restricted his reading/viewing of the *Swank* and *Fox* publications. This is

---

2. Although Plaintiff asserts that some sexual offenders are permitted to view hard core pornography, it seems obvious that this would be done in a controlled environment and may be limited, for example, to showing pictures of heterosexual adult consensual sex to an inmate who is a pedophile. This controlled use of hard core pornography for treatment, even if it does occur, does not demonstrate the unreasonableness of the rehabilitative goals of DOC and WSR policy.

the question that was remanded to the district court in *Thornburgh.* After reviewing the materials, it is clear that they satisfy the objective criteria for sexually explicit material identified by the DOC policy and WSR regulation; in other words, the magazines fall within what the policy/regulation purports to restrict.[3] The question thus becomes whether the materials were *unreasonably* restricted in light of the legitimate penological goals of prison security and rehabilitation.

The Court begins by noting that the materials restricted are not obscene and are therefore entitled to First Amendment protection, although they are not high on the ladder of First Amendment speech: *Swank* and *Fox* are certainly not the Federalist Papers. With this in mind and with great deference to the needs of the prison to restrict material that may pose an institutional threat to the security of the prison or the rehabilitation of certain inmates, the Court finds that the copies of *Swank* and *Fox* were appropriately restricted under the test enunciated in *Turner* based on WSR's concern with achieving its legitimate penological goals.[4]

The Court notes that Defendant Rolf's decision to restrict the publications was not an exaggerated response to institutional concerns. Defendant Rolfs personally reviewed each publication to determine whether the publication fell under the DOC policy and also posed a legitimate threat to penological goals. The exhibits provided by Defendants, including expert testimony on the dangers of sexually explicit material, support Defendant Rolf's decision. *See Owen v. Wille,* 117 F.3d 1235 (11th Cir.1997). The copies of *Swank* and *Fox* discuss in explicit terms and in graphic detail heterosexual and homosexual sex. (*See* Doc. # 49, Exs. # 21–36). Besides picturing women in submissive roles, the magazines give the impression that women seek out and enjoy any and all kinds of

sexual activity. The record reflects and the Court recognizes that this distorted picture of male/female relationships could *reasonably* be viewed to hamper prison security and to present a problem for the rehabilitation of sexual offenders at WSR. Although one could quibble with the DOC's and WSR's conclusions (*see, e.g.,* Doc. # 55, Ex. D at 2), it is not the Court's place to micro manage the prison environment based on how it weighs in on the scientific debate concerning the effects of sexually explicit materials on the reader of such materials, especially when the class of readers in this case includes sexual offenders and persons willing to engage in both heterosexual and homosexual rape. *See Stefanow v. McFadden,* 103 F.3d 1466 (9th Cir.1996) (deferring to prison officials in confiscating book based on its content); *Harper v. Wallingford,* 877 F.2d 728 (9th Cir.1989) (same).

### 3. Plaintiff's Fourteenth Amendment Due Process Claim

Plaintiff claims generally that his due process rights were violated by the rejection of the *Swank* and *Fox* magazines. (Doc. # 30 at 7). As noted *supra,* the actions of Defendants were not arbitrary. In addition, Plaintiff admits that he received copies of the rejection notices generated by the WSR mail room staff. Plaintiff had the right to appeal these rejections. *See* WAC 137–48–050(1)–(3). There is no indication that Plaintiff utilized this process, although one of his fellow inmates was apparently successful in a similar appeal. (Doc. # 55, Ex. B at 2). Plaintiff has failed to show that his procedural or substantive due process rights were violated by the rejection of the *Swank* and *Fox* magazines.

### B. Plaintiff's Motion for Appointment of Counsel

On August 1, 1997, Plaintiff filed a motion for appointment of counsel. (Doc. # 53).

---

3. Plaintiff claims that Defendants have "blacked out" much of the exhibits 21 through 36 which accompany their motion for summary judgment. (Doc. # 55, Ex. A at 2). Plaintiff has made no showing of what material was blacked out, nor has he moved for production of complete copies of the materials or demonstrated that he was unable to prepare a response without the materials. Defendants also submitted to the Court publication lists which were blacked out in large part; this did not, however, prevent the Court from determining Defendant's partial explanation for concluding that the publications at issue violated DOC policy and WSR regulation.

4. Because of the recommended disposition, the Court has not discussed Defendants' qualified immunity defenses.

The Court interprets Plaintiff's motion as a motion for reconsideration of the Court's prior order denying appointment of counsel. (Docs.# 12, # 16). Under CR 7(3), motions "for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." CR 7(e)(1).

Plaintiff has not brought any new facts to the Court's attention which now warrant the appointment of counsel. Although Plaintiff claims that certain exhibits which contained information regarding "what publications ... are to be rejected and partial reasons for rejecting said publications" submitted in support of Defendants' motion for summary judgment were redacted in part (Doc. # 53 at 2), this information was also submitted to the Court in redacted form. The information was not essential to understanding why Defendants rejected the editions of *Swank* and *Fox* at issue in this case. In addition, although Plaintiff claims that he was unable to engage in discovery with Defendant's experts, he never moved to compel discovery at any point in this proceeding.

To reiterate, Plaintiff has not presented exceptional circumstances which warrant the appointment of counsel. Plaintiff did more than a competent job of representing himself, and for the reasons discussed in this report, he is unlikely to be successful in this action.

## IV. CONCLUSION

In light of the foregoing, the Court recommends that Defendants' motion for summary judgment be GRANTED, Plaintiff's motion for appointment of counsel DENIED, and this action dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

DATED this 12th day of September, 1997.