[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14141
Non-Argument Calendar
_____

D.C. Docket No. 6:17-cv-00004-JRH-RSB

EDGAR QUINTANILLA,

Plaintiff-Appellant,

versus

HOMER BRYSON,
Commissioner, State of Georgia's Department of Corrections,
in his individual and official capacity,
ROBERT TOOLE,
Southern Region's Director of Facilities Operation,
in his individual and official capacity,
OTIS STANTON,
In his individual and official capacity,
WARDEN DOUG WILLIAMS,
In his individual and official capacity,
ERIC SMOKES,
Tier II Unit Manager,
in his individual and official capacity, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(April 5, 2018)

Before MARTIN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Edgar Quintanilla is a Georgia state prisoner housed in the Tier II Administrative Segregation Unit ("Tier II") at Smith State Prison ("Smith") in Glennville, Georgia. He filed this *pro se* lawsuit alleging that his confinement in administrative segregation—more commonly known as solitary confinement—violates the Eighth Amendment's prohibition on cruel and unusual punishment and his due-process rights under the Fourteenth Amendment. The district court screened Quintanilla's complaint and dismissed it *sua sponte* for failure to state a claim. Because we conclude that his complaint either stated or potentially could state plausible claims to relief, we vacate and remand for further proceedings.

**I.**

**A.**

As a prisoner in administrative segregation, Quintanilla "almost exclusively . . . sees nothing, does nothing, and interacts with no one." Doc. 1 ¶ 63. Since March 2016, he has spent at least 23 hours of each day in a cell that has been

2

"stripped down to the standard of an 'isolation cell.'" *Id.* ¶ 32. Apart from his bed, he lacks a place to sit or write. *See id.* Welded metal plates cover the window and door of his cell, preventing him from seeing beyond his own four walls. *Id.* ¶ 33. He cannot even see himself, as he lacks access to a mirrored surface. *Id.* ¶ 34. He is permitted some stationery items, like paper, pens, and envelopes, but he is deprived of virtually all other personal property.[1] *Id.* ¶ 42. Nearly all outside mail, apart from bare letters, is confiscated and either withheld indefinitely or destroyed. *Id.* ¶ 44. At best, he is permitted one two-hour non-contact visit per month and one fifteen-minute phone call per month. *Id.* ¶¶ 39, 41.

Though prison regulations mandate five hours of recreation each week, Quintanilla is "rarely, if ever, permitted any weekly out-of-cell recreation." *Id.* ¶ 35. On the rare occasions he is allowed to leave his cell for recreation, he is confined to a 7-foot-by-16-foot concrete enclosure covered by a metal grate. *Id.* ¶ 36. Due to the conditions of his confinement and his lack of exercise, he suffers from migraines, heartburn, stomach cramps, severe neck and back pain, stiffness in his joints, constipation, lethargy, and depression. *Id.* ¶ 38.

Quintanilla alleges that he receives smaller and less nutritious portions of food than the general population and is being "systematic[ally] starv[ed]." *Id.*

---

[1] Some of Quintanilla's allegations relate specifically to "Phase One"—the most restrictive phase—of Tier II's three-phase "behavior-modification program," but he states that the "general confinement conditions" in the other phases "do not much differ." Doc. 1 ¶ 46. Quintanilla explains that Tier II prisoners must progress through the three phases to be considered for transfer to the general population. *Id.* ¶¶ 29–30.

¶¶ 60–61.  And he cannot purchase items from the commissary in order to supplement the meager meals.  *Id.* ¶ 43.  He also does not receive utensils with which to eat.  *Id.* ¶ 60.

Quintanilla's "already decrepit" cell has an "excessive vermin and insect infestation," including rats, mosquitoes, and spiders.  *Id.* ¶ 58.  Prison officials haven't made adequate arrangements to sanitize his cell, and they deny him the ability to sanitize it himself.  *Id.*  Plus, he lacks access to the commissary, so he cannot purchase personal hygiene items.  *Id.* ¶ 43.  And while he can shower three times per week, the shower areas are "decrepit" and "flooded."  *Id.* ¶ 59.

## B.

Before he was transferred to Smith, Quintanilla was housed in a general-population dormitory at Wheeler Correctional Facility ("Wheeler") in Alamo, Georgia.  Doc. 1 ¶ 13.  He had not had a disciplinary report for over two years prior to his transfer.  Doc. 1-2.

On March 23, 2016, a fight broke out between many black and Hispanic prisoners in Quintanilla's housing dormitory.  Doc. 1 ¶ 14.  Quintanilla says he was not involved in the fight, an assertion allegedly corroborated by video footage.  ¶¶ 14–15.  But prison officials placed him in segregation, anyway, without first serving him with a disciplinary report alleging a violation of any prison rules.  *Id.*

4

¶ 16.  After the fight, prison officials told him "that he had to be moved because he was Hispanic."  *Id*.  He transferred to Smith on March 25.  *Id.* ¶ 17.

When he arrived at Smith, Quintanilla was immediately placed in Tier II, an administrative-segregation wing, and refused all his personal property.  *Id.* ¶ 18. Prison regulations require a "classification committee" to conduct an initial assignment hearing within 96 hours of placement in Tier II.  *Id.* ¶¶ 23–26. Quintanilla never received a hearing, however, nor did he receive any information about the reasons for his placement until April 4, ten days later.  *Id.* ¶ 19.  On that date, Eric Smokes, the Tier II Unit Manager and one of the three classification-committee members[2], *id.* ¶ 9, gave him two pieces of paper: (1) a Tier II assignment memo; and (2) a Tier II assignment appeal form, *id.* ¶ 20.   Both documents stated that he had been assigned to Tier II for "participation in a disturbance/disruptive event" at Wheeler.  *Id.* ¶ 20.

Quintanilla completed and submitted the appeal form on April 6.  *Id.* ¶ 27. He wrote that he was not involved in the disturbance at Wheeler, so he was not eligible for placement in Tier II, and that video footage would confirm his account. Doc. 1-2.  Six days later, his appeal was denied by Otis Stanton as designee for

---

[2] The other two classification-committee members, according to Quintanilla, were Lieutenant Deric Godfrey, the officer in charge of the Tier II program, and "Mrs. Watkins," a correctional officer who acted as a counselor in the Tier II program.  Doc. 1 ¶¶ 10–11.

Robert Toole, the Southern Region's Director of Facilities Operation. Stanton wrote that Quintanilla "has met criteria for Tier II." *Id.*; Doc. 1 ¶ 28.

On at least two occasions, prison officials have decided to extend Quintanilla's solitary confinement. But Quintanilla has never received a hearing on the matter, and the reasons for the extensions, if any, have been withheld. *See* Doc. 11-1 ¶ 23. He alleges that his solitary confinement is effectively indefinite. Doc. 1 ¶ 56; Doc. 14-1 ¶ 17.

On December 28, 2016, Smokes told Quintanilla that he had successfully completed the Tier II program and that Smokes would recommend his reassignment to the general prison population. Doc. 11-1 ¶ 14. But, Smokes said, he would remain in Tier II until "further notice." *Id.* On that same date, Quintanilla signed an unidentified document, but he was never provided any notice of the reasons for his continued assignment to Tier II. *Id.* ¶ 21. As a result, he could not appeal his confinement at that time. *Id.* ¶ 22.

On March 16, 2017, Quintanilla again met with Smokes, who gave him a document stating that the classification committee had conducted a 90-day review and recommended that he remain in administrative segregation. Doc. 14-1 ¶¶ 12–13. He appealed, pointing out that prison officials had failed to provide him any reasons for denying either reassignment to the general prison population or a hearing on the matter. *Id.* ¶ 15. His appeal was denied without explanation, just a

check mark by Warden Doug Williams that he "concur[red]" with the classification committee's recommendation. *Id.* ¶ 16; Doc. 14-1, Exh. A.

## II.

Quintanilla filed a handwritten complaint in January 2017, seeking both damages and injunctive relief under 42 U.S.C. § 1983. He later submitted two supplemental handwritten filings, in February and April, updating the court with additional allegations. Unless otherwise noted, we refer to all three filings as the "complaint." In his complaint, Quintanilla claimed that his solitary confinement—in its length, its conditions, its arbitrariness, and its lack of review—violates his constitutional rights under the Eighth and Fourteenth Amendments.

In August 2017, a magistrate judge, after granting Quintanilla leave to proceed *in forma pauperis*, screened his complaint to determine whether it stated a claim on which relief could be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B) & 1915A. The magistrate judge then issued a report and recommendation ("R&R") in which he concluded that Quintanilla's claims should be dismissed without requiring a response from the defendants.

The magistrate judge construed Quintanilla's filings to raise four claims under § 1983: (1) a procedural due-process claim; (2) a substantive due-process claim; (3) an Eighth Amendment conditions-of-confinement claim; and (4) a claim of supervisory liability against the Commissioner of the Georgia Department of

Corrections.[3]  The procedural due-process claim failed, according to the R&R, because his allegations—though sufficient to show atypical and significant hardship in relation to the ordinary incidents of prison life, so as to create a liberty interest protected by due process—did not plausibly establish that he received inadequate process, in light of the two separate reviews of his assignment to Tier II.  The substantive due-process claim failed, the R&R concluded, because there was "no objectively, deeply rooted history and practice in this Nation to be free from segregation or even a segregation with more adverse conditions."  The Eighth Amendment claim failed, according to the R&R, because Quintanilla failed to plausibly allege that he was deprived of the minimal civilized measure of life's necessities.  And, finally, the R&R concluded that the Commissioner was not liable because Quintanilla alleged no facts to show that the Commissioner was personally involved or that the alleged violations of his rights were the result of a policy the Commissioner enacted.

Quintanilla filed extensive *pro se* objections, which the district court overruled in adopting the magistrate judge's report and recommendation.  Quintanilla now brings this timely appeal.  He is represented by counsel on appeal.

**III.**

---

[3] Quintanilla also brought a claim under a criminal statute, which he has since abandoned.

8

We review *de novo* a district court's *sua sponte* dismissal under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii) for failure to state a claim. *Leal v. Ga. Dep't of Corr.*, 254 F.3d 1276, 1278–79 (11th Cir. 2001). Both provisions authorize the *sua sponte* dismissal for failure to state a claim of a complaint filed by a prisoner proceeding *in forma pauperis*. *See* 28 U.S.C. § 1915A(b)(1) (authorizing *sua sponte* dismissal of prisoner claims against government entities or employees); 28 U.S.C. § 1915(e)(2)(B)(ii) (authorizing *sua sponte* dismissal of claims filed by litigants proceeding *in forma pauperis*). A dismissal for failure to state a claim under either provision is governed by the same standard as a dismissal under Federal Rule of Civil Procedure 12(b)(6). *Leal*, 254 F.3d at 1278–79; *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997).

In reviewing a dismissal for failure to state a claim, we accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). To avoid dismissal for failure to state a claim, the complaint "must include enough facts to state a claim to relief that is plausible on its face." *Id.* (quotation marks omitted). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quotation marks omitted). In other words, the

9

"[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.

Quintanilla's briefing to this Court tracks, in broad terms, the district court's construction of his claims. We follow suit. And given the early procedural posture of this case—a *sua sponte* dismissal before any defendant responded—we limit our discussion to the basis of the district court's ruling on each claim.[4]

### A.    *Procedural Due Process*

To make out a denial-of-procedural-due-process claim under § 1983, a plaintiff must establish three elements: (1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process. *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The first two elements are not at issue. The district court found the first element met, and we agree that Quintanilla's allegations appear to establish the imposition of "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," so as to create a liberty interest protected by due process. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005). In addition, Quintanilla plainly challenges state action.

---

[4] The defendants below were not served with the complaint and are not participating in this appeal. In these circumstances, we find it prudent to resolve only those issues that the district court actually decided in dismissing Quintanilla's complaint, leaving other matters to be addressed, as appropriate, on remand.

Thus, the only question we must answer is whether Quintanilla's allegations show that he received constitutionally inadequate process.

In *Hewitt v. Helms*, the Supreme Court described, albeit in *dicta*, what process is due from prison officials making administrative-segregation determinations when a liberty interest is at stake.[5]  459 U.S. 460 (1983).  When the initial confinement decision is contemplated or made, whether for institutional safety reasons or to separate the prisoner pending an investigation, the prisoner must "receive some notice of the charges against him and an opportunity to present his views," whether at a hearing or in writing.  *Id.* at 476.  "[W]ithin a reasonable time" after the confinement begins, prison officials must then conduct an "informal, nonadversary evidentiary review" of whether the confinement is justified.  *Id.*  This review may "turn[] largely on purely subjective evaluations and on predictions of future behavior."  *Id.* at 474.

Once a prisoner is confined in administrative segregation involving atypical and significant hardship, there must be "some sort of periodic review of the confinement."  *Magluta v. Samples*, 375 F.3d 1269, 1279 n.7 (11th Cir. 2004) (quoting *Hewitt*, 459 U.S. at 477 n.9).  "This review will not necessarily require that prison officials permit the submission of any additional evidence or

---

[5] The Supreme Court in *Sandin* abrogated *Hewitt*'s methodology for establishing a liberty interest, but *Hewitt* "remain[s] instructive for [its] discussion of the appropriate level of procedural safeguards."  *Wilkinson v. Austin*, 545 U.S. 209, 228–29 (2005).

11

statements." *Hewitt*, 459 U.S. at 477 n.9. Moreover, the review is flexible and may be based on "a wide range of administrative considerations," including but not limited to observations of the inmate in administrative segregation, "general knowledge of prison conditions," misconduct charges, ongoing tensions in the prison, and any ongoing investigations. *Id.* Many of these matters may not be subject to "proof in any highly structured manner." *Id.*

Nevertheless, "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Id.* Not only must there be "some sort of periodic review," but the periodic review "must be meaningful; it cannot be a sham or a pretext." *Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012); *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975) ("[W]here an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population."); *cf. Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation marks omitted)). Reviewing officials must be guided by whether confinement in administrative segregation remains necessary in light of current facts and valid administrative justifications. *Proctor v. LeClaire*, 846 F.3d 597, 611 (2d Cir. 2017) ("[R]eviewing officials must evaluate whether the

12

justification for [administrative segregation] exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available."); *see Hewitt*, 459 U.S. at 477 n.9 (describing the periodic-review decision as "whether a prisoner *remains* a security risk" (emphasis added)).

Here, Quintanilla's complaint plausibly states a § 1983 claim for the denial of procedural due process. Regarding his initial placement in administrative segregation, Quintanilla alleges that the decision was arbitrary because he did not receive a hearing and he was not charged with or found guilty of any misconduct. While he was able to appeal the classification committee's placement decision after his transfer, the committee did not address his claims of innocence or explain its decision beyond stating that he "met criteria for Tier II." Plus, he was initially told that "he had to be moved because he was Hispanic," not because he was involved in the fight. We conclude that these allegations are enough, at this early stage, to state a claim that prison officials failed to conduct a meaningful initial review of whether his confinement was justified. *See Hewitt*, 459 U.S. at 476.

Beyond the initial placement decision, Quintanilla plausibly alleged the lack of meaningful periodic reviews of his confinement in administrative segregation. By the time of the first "90-day" review in December 2016, nine months after his initial placement in administrative segregation, he had completed the three phases of the Tier II program, and Smokes said that he would recommend Quintanilla's

transfer to the general population.  Yet prison officials continued his confinement in administrative segregation without explanation.  At his next 90-day review on March 16, 2017, the classification committee recommended, and the warden agreed, that Quintanilla remain in Tier II.  But, again, they did not say why.  And the only reason apparent from his complaint is his alleged involvement in the disturbance at Wheeler.  Given Quintanilla's allegations of good behavior and progress through the Tier II program, however, that past act alone is not sufficient to justify his continued confinement because the decision cannot be "based solely on past events that will never change."  *Proctor*, 846 F.3d at 612.

Accepting these allegations as true and drawing all reasonable inferences in Quintanilla's favor, we conclude that he has plausibly alleged that his periodic reviews were "hollow formalities" unconnected to the legitimate administrative interests of the institution.  In light of Quintanilla's progress through the three phases of the Tier II program, Smokes's statement that he would recommend Quintanilla's transfer to the general prison population, and the absence of any explanation by the prison of its reasons for keeping him confined in administrative segregation, Quintanilla adequately alleged that prison officials have failed to

14

conduct *meaningful* periodic reviews of his confinement in administrative segregation.[6] *See Magluta*, 375 F.3d at 1279 n.7.

For these reasons, we conclude that Quintanilla's complaint states a plausible claim that he was denied constitutionally adequate process.

**B.    *Conditions of Confinement***

Quintanilla's advances his Eighth Amendment claim on two tracks. First, he complains that the conditions of his confinement fall below minimal constitutional standards of decency. Second, he complains that the conditions of his confinement do not serve any legitimate penological interest. The district court dismissed this claim, concluding that the conditions of his confinement did not deprive him of the minimal civilized measure of life's necessities.

The Eighth Amendment "set[s] limits on the treatment and conditions that states may impose on prisoners." *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1571 (11th Cir. 1985). "[U]nder the Eighth Amendment, the State must respect the human attributes even of those who have committed serious crimes." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The Eighth Amendment also prohibits

---

[6] We may not review the substance of the prison's decision under the guise of procedural due process, *see Proctor*, 846 F.3d at 609, but the absence of any justification for holding him in administrative segregation bears upon the question of whether he received due process. *Cf. Superintendent, Mass. Corrs. Inst. v. Hill*, 472 U.S. 445, 454 (1985) (holding that a disciplinary decision to revoke good time credits "does not comport with the minimum requirements of procedural due process unless the findings of the prison disciplinary board are supported by some evidence in the record" (citation and quotation marks omitted)).

15

"inflictions of pain . . . that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotation marks omitted).

We have explained that a two-part analysis governs Eighth Amendment challenges to conditions of confinement. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). First, the conditions of confinement must be objectively "serious" or "extreme." *Id.* This means that the prisoner "must show that a condition of his confinement pose[s] an unreasonable risk of serious damage to his future health or safety." *Id.* (quotation marks omitted). Second, the prisoner must show that the defendant prison officials subjectively acted with "deliberate indifference" with regard to the conditions at issue. *Id.*

Conditions are objectively serious or extreme if they amount to a deprivation of the "minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 347, or "the basic human needs," including "reasonably adequate food, clothing, shelter, and sanitation," *Hamm*, 774 F.2d at 1572. Whether conditions of confinement are cruel and unusual is judged under a "contemporary standard of decency"—that is, "the evolving standards of decency that mark the progress of a maturing society." *Rhodes*, 452 U.S. at 346–47 (quotation marks omitted). Under current precedent, "administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment." *Sheley v. Dugger*, 833 F.2d 1420, 1428–29 (11th Cir. 1987). Nevertheless, "[c]onfinement . . . in an isolation cell is

16

a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978).

In evaluating the conditions of Quintanilla's confinement, we consider not only the "food, clothing, sanitation, medical care, and personal safety" he was afforded, but also "the length of time in isolation." *Sheley*, 833 F.2d at 1428–29. The length of time is significant because a condition might be tolerable for a few days but intolerable over a long period. *Cf. Hutto*, 437 U.S. at 686–87 ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.").

Liberally construing Quintanilla's complaint and accepting his allegations as true, Quintanilla's allegations are sufficient to state a deprivation of his basic human needs. "This Court, and the old Fifth Circuit, have long recognized a well established Eighth Amendment right not to be confined . . . in conditions lacking basic sanitation." *Brooks v. Warden*, 800 F.3d 1295, 1303 (11th Cir. 2015). The right to basic sanitation includes the right not to be deprived of the basic elements of hygiene. *See id.* at 1304 (citing other cases).

Quintanilla alleged that, since March 2016, he has spent nearly all of his time in an isolation cell with "an excessive vermin and insect infestation," including rats, mosquitoes, and spiders. The prison does not adequately clean his cell and he is denied the adequate opportunity to clean it himself. He cannot

17

purchase hygienic items from the commissary. And while he is permitted to shower three times a week, the showers are "decrepit" and "flooded." These allegations of near-constant exposure to unhygienic conditions, for at least one year, state an Eighth Amendment violation because they allege a deprivation of the basic elements of hygiene. *See Gray v. Hardy*, 826 F.3d 1000, 1005–06 (7th Cir. 2016) (holding that evidence of "myriad infestations and . . . lack of access to adequate cleaning supplies, taken together," was enough to show a deprivation of "the basic human need of rudimentary sanitation"); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) ("[A]llegations of unhygienic conditions, when combined with the jail's failure to provide detainees with a way to clean for themselves with running water or other supplies, state a claim for relief.").

Basic hygiene is not the only basic human need implicated by Quintanilla's allegations. He alleges that he is also being denied adequate food, exercise, and human contact. He complains that he is being "systematic[ally] starv[ed]" and that he is rarely, if ever, allowed out-of-cell recreation. He alleges that, due to these deprivations, he suffers from migraines, heartburn, stomach cramps, severe neck and back pain, stiffness in his joints, constipation, lethargy, and depression. We believe that further factual development is warranted before it can be concluded that these conditions, whether alone or in combination, are enough to show the deprivation of his basic human needs.

18

Conditions that fall below minimal constitutional standards of decency do not alone amount to a violation of the Eighth Amendment, however, because Quintanilla must show that the defendants were deliberately indifferent to the risks the conditions posed to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks omitted). Quintanilla asserts that the risks were so obvious that the prison officials should be charged with actual knowledge, but the district court did not reach this issue. Given the early stage of proceedings in this case, we decline to reach this issue and instead leave it for the district court to address in the first instance on remand, where Quintanilla should, at the very least, be given an opportunity to amend his complaint.

Finally, Quintanilla's complaint plausibly alleges that his confinement in administrative segregation is arbitrary and "without penological justification." Specifically, his allegations call into question whether prison officials believe they have legitimate reasons for confining him in administrative segregation. *See Bass v. Perrin*, 170 F.3d 1312, 1316–17 (11th Cir. 1999) (concluding that the denial of exercise time in the yard did not violate the Eighth Amendment because it "cannot be said to be unnecessary," where the prisoners were a "threat to the safety and security of the prison"). Arbitrary placement in the conditions described above surely constitutes "the gratuitous infliction of suffering" in violation of the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

For these reasons, we conclude that the district court erred in dismissing Quintanilla's claim under the Eighth Amendment.

## C.    Substantive Due Process

Quintanilla contends that his allegations of arbitrary confinement in administrative segregation for nearly two years state an as-applied claim that the defendants' conduct violated his substantive due-process rights. We cannot tell, however, how this claim is any different than his Eighth Amendment claim. And it likely is not viable as a result.

Substantive due process broadly "protects against the arbitrary and oppressive exercise of government power." *Waldman v. Conway*, 871 F.3d 1283, 1292–93 (11th Cir. 2017). "Executive action is arbitrary in a constitutional sense when it shocks the conscience." *Id.* (quotation marks omitted). However, the Supreme Court has explained that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 276 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Here, the Eighth Amendment provides an explicit textual source for Quintanilla's challenge to the conditions of his confinement and the lack of

penological justification. For that reason, he likely cannot bring a substantive due-process claim based on the same allegations. *See id.* The contours of this claim were not well developed below, however, and we cannot say, at this early stage, that it would be futile to allow him to amend his complaint. *See Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir.1991) (when it appears that a *pro se* plaintiff's complaint, if more carefully drafted, might state a claim, the district court should give the pro se plaintiff an opportunity to amend his complaint instead of dismissing it), *overruled in part by Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir.2002) (*en banc*).

## D.    Claim against Commissioner

Finally, we vacate and remand the dismissal of Quintanilla's claims against the Commissioner of the Georgia Department of Corrections. The district court found that the Commissioner was not individually liable for the misconduct alleged. But Quintanilla also alleged an official-capacity claim against the Commissioner seeking injunctive relief under the *Ex Parte Young* Doctrine. And "[p]ersonal action by [defendants] is not a necessary condition of injunctive relief against state officers in their official capacity." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1998). Accordingly, the district court erred in failing to address Quintanilla's official-capacity claim.

21

Quintanilla also contends that he stated a plausible claim against Homer Bryson, the former Commissioner, in his personal capacity. That claim, according to Quintanilla's brief on appeal, is based on the prison regulations over which Bryson exercised supervisory authority. However, in reading the complaint, it's not clear whether Quintanilla intended to challenge the regulations themselves or just how they were applied by the prison staff. And the only specific claim mentioning the Commissioner alleged a violation of a criminal statute, which Quintanilla has since abandoned. Nevertheless, because we vacate and remand for further proceedings on his other claims, Quintanilla should be granted leave to amend to clarify this claim as well.

## V.

For these reasons, we conclude that Quintanilla's lawsuit was dismissed prematurely because he either stated, or potentially could state, plausible claims to relief. We therefore vacate the judgment dismissing his complaint and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**